IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARK ALLEN PINNELL,                          06-CV-828-BR

        Petitioner,                          OPINION AND ORDER

v.

BRIAN BELLEQUE, Warden,

        Respondent.

**STEVEN T. WAX**
Federal Public Defender
**C. RENEE MANES**
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, OR  97204
(503) 326-2123

        Attorneys for Petitioner

**JOHN R. KROGER**
Attorney General
**CAROLYN ALEXANDER**
**TIMOTHY A. SYLWESTER**
Assistant Attorneys General
1162 Court Street N.E.
Salem, OR  97301
(503) 378-4402

        Attorneys for Respondent

1 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Respondent Brian Belleque's Motion (#108) for Partial Summary Judgment on exhaustion/procedural default grounds and Petitioner Mark Allen Pinnell's Motion (#120) for Evidentiary Hearing on the adequacy of state-court process and the existence of state-created impediments.

In its Motion for Partial Summary Judgment, the State seeks to preclude analysis on the merits of one or more of the claims set forth in Petitioner's First Amended Petition for Writ of Habeas Corpus on the basis that such claims are unexhausted and/or procedurally defaulted.

In his Response to the State's Motion, Petitioner asserts he fairly presented and exhausted certain claims that the State characterizes as defaulted. According to Petitioner, he is also excused from exhausting certain other claims on the basis that a state-court remedy was not available, a clear or consistent rule pertaining to the claims did not exist, or the claims were not previously available. In addition, Petitioner contends any default should be excused because he can satisfy both exceptions to procedural default; namely, the fundamental miscarriage-of-justice exception and the cause-and-prejudice exception. In Petitioner's Motion for an Evidentiary Hearing, he seeks a hearing to develop the record further in support of his argument

2 - OPINION AND ORDER

that he can satisfy the cause-and-prejudice exception to procedural default.

For the following reasons, the Court **GRANTS in part** and **DENIES in part** Respondent's Motion and **DENIES in part** Petitioner's Motion.


## FACTUAL BACKGROUND

In August 1985 Petitioner contacted Randy Brown in response to an advertisement that Brown had placed in *Swing N Sway* magazine.  Petitioner and Brown met and engaged in sex.  On approximately September 9, 1985, Petitioner contacted Brown and arranged to meet him that evening at Brown's residence.  A friend dropped off Petitioner and another friend, Donald Cornell, at Brown's house.  Upon entry, the two men blindfolded and gagged Brown and tied his hands and feet behind his back with an electrical cord.  They threatened him with a knife, and one of them kicked him in the side of the head when he attempted to free himself.  Petitioner and Cornell ransacked the house, left Brown bound and gagged on the bathroom floor, and left in Brown's pickup after loading it with his belongings.  Brown eventually managed to get help and ultimately did not sustain any permanent injuries.

On approximately September 19, 1985, Petitioner called John Ruffner, who also had placed an advertisement in the same issue

of *Swing N Sway* magazine as Brown.  Petitioner, Cornell, and Velma Varzali drove in a borrowed car to Ruffner's apartment. Petitioner went inside to see Ruffner, and Cornell followed in five minutes.  Several hours later, Petitioner and Cornell returned to the car, loaded it with Ruffner's belongings, and drove away.

The next day, September 20, 1985, Ruffner's body was discovered on the bathroom floor of his ransacked apartment.  His hands and feet were bound behind his back in part with electrical cords ripped from appliances in the apartment.  A large wad of tissue paper was stuffed in his mouth, he was gagged, and a ligature was wrapped around his neck.  An autopsy revealed he died of asphyxiation as a result of the wad of tissue, the ligature, or a combination of both.  He also had cuts on his hands and had sustained a blunt-force injury to his head.

On September 22, 1985, Petitioner and Cornell were arrested in connection with Ruffner's murder.

### PROCEDURAL BACKGROUND

On October 23, 1985, a Washington County Grand Jury returned an indictment jointly charging Petitioner and Cornell with one count of Aggravated Murder and two counts of Felony Murder.  The trial court granted Petitioner's demurrer to the charge of Aggravated Murder based on the allegation of torture, and the

State of Oregon appealed.  On February 11, 1987, the Oregon Court of Appeals affirmed the trial court, but the Oregon Supreme Court reversed and remanded on August 24, 1987, with instructions to reinstate the indictment as originally charged.  *State of Or. v. Pinnell*, 304 Or. 27 (1987).

On January 7, 1988, the Washington County Grand Jury returned a second (but not superseding) indictment jointly charging Petitioner and Cornell with five additional counts of Aggravated Murder.  Petitioner was tried first and separately from Cornell in May and June 1988.  A jury found Petitioner guilty on all counts.  Petitioner was sentenced to death on October 7, 1988.  On direct review, the Oregon Supreme Court upheld Petitioner's convictions but remanded for a new penalty-phase trial.  *State of Or. v. Pinnell*, 311 Or. 98 (1991).

Cornell was tried in July 1988 and was convicted of only two counts of Felony Murder.  *State v. Cornell*, 109 Or. App. 396 (1991).

Petitioner's second penalty-phase trial was held in 1992, and the jury again sentenced him to death.  On direct review, the Oregon Supreme Court upheld the death sentence.  *State of Or. v. Pinnell*, 319 Or. 438 (1994).  The Oregon Supreme Court entered its judgment on September 7, 1994.  Petitioner did not file a petition for writ of *certiorari* in the United States Supreme Court.

5 - OPINION AND ORDER

On November 3, 1994, Petitioner filed a petition for post-conviction relief (PCR) in state court. The PCR court held an evidentiary trial and denied Petitioner's request for relief on January 3, 2001. While Petitioner's PCR appeal was pending in the Oregon Court of Appeals, Petitioner filed a successive PCR petition in state court on June 24, 2003. *Pinnell v. Belleque*, Marion County Circuit Court Case No. 03C-15644. On February 2, 2004, the state court entered final judgment dismissing the successive petition without prejudice. Petitioner did not appeal this judgment of the PCR court.

In 2005, the Oregon Court of Appeals affirmed the first PCR judgment in a written opinion, and, thereafter, the Oregon Supreme Court denied Petitioner's petition for review without comment. *Pinnell v. Palmateer*, 200 Or. App. 303 (2005), *rev. denied*, 340 Or. 483 (2006). On May 24, 2006, the Oregon Supreme Court entered its judgment. Petitioner did not file a petition for writ of *certiorari* in the United States Supreme Court regarding these decisions.

On May 24, 2007, Petitioner timely filed his Petition for Writ of Habeas Corpus (#70) in this Court.

On January 25, 2008, the State moved for partial summary judgment on exhaustion/procedural default grounds. On May 1, 2008, Petitioner moved for an evidentiary hearing on the adequacy

of the state-court process and the existence of state-created impediments.

## DISCUSSION

The Court first addresses the issues pertaining to fair presentation and the exhaustion requirement for the purpose of identifying any claims that are defaulted. Next, the Court will apply the two exceptions to procedural default to the identified defaulted claims. Finally, the Court will consider Petitioner's Motion, if necessary, to determine whether he is entitled to an evidentiary hearing to develop the record further in support of his contention that he can satisfy the cause-and-prejudice exception to procedural default.

## STANDARDS

### I.  Summary Judgment

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial. *Id.*

An issue of fact is material "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Id*.  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues."  *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).  A mere disagreement about a material issue of fact, however, does not preclude summary judgment.  *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1389 (9th Cir. 1990).

When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary."  *Wong v. Regents of Univ. of Cal.*, 379 F.3d 1097 (9th Cir. 2004), *as amended by* 410 F.3d 1052, 1055 (9th Cir. 2005)(citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998)).

The substantive law governing a claim or a defense determines whether a fact is material.  *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id*.

The Federal Rules of Civil Procedure apply to habeas proceedings to the extent that the practice in such proceedings is not set forth in the Rules Governing 2254 Cases. Fed. R. Civ. P. 81(a)(2). *See also Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977)(summary judgment is an appropriate vehicle for resolving habeas-corpus cases).

## II.  Exhaustion and Procedural Default

A habeas petitioner must exhaust his claims by presenting them to the state's highest court either through a direct appeal or collateral proceedings before a federal court will consider the merits of those claims. *Smith v. Baldwin*, 510 F.3d 1127, 1137-38 (9th Cir. 2007)(citing *Rose v. Lundy*, 455 U.S. 509, 515 (1982)). "As a general rule, a petitioner satisfies the exhaustion requirement by fairly presenting the federal claim to the appropriate state courts . . . in the manner required by the state courts, thereby 'affording the state courts a meaningful opportunity to consider allegations of legal error.'" *Casey v. Moore*, 386 F.3d 896, 915-16 (9th Cir. 2004)(quoting *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986)). If a habeas petitioner failed to present his claims to the state courts in a procedural context in which the merits of the claims were considered, the claims have not been fairly presented to the state courts and, therefore, are not eligible for federal habeas review. *Id.* at 916-18 (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)).

A petitioner is deemed to have "procedurally defaulted" his claim if he failed to comply with a state procedural rule or failed to raise his claim at the state level. *Peterson v. Lampert,* 319 F.3d 1153, 1156 (9th Cir. 2003)(citing O'Sullivan v. Boerckel, 526 U.S. 838, 844-45, 848 (1999)). *See also Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Similarly, if a federal constitutional claim is expressly rejected by a state court on the basis of a state procedural rule that is independent of the federal question and adequate to support the judgment, the claim is procedurally defaulted. *Coleman, 501 U.S.* at 729-30. *See also Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir.), *cert. denied*, 540 U.S. 938 (2003).

Nonetheless, a procedural default may be excused if the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. In the habeas-corpus context, a fundamental miscarriage of justice occurs when a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Smith*, 510 F.3d at 1139 (citing *McClesky v. Zant*, 499 U.S. 467, 494 (1991)). *See also Murray v. Carrier*, 477 U.S. 478, 496 (1986).

## DISCUSSION

The State either concedes the following claims[1] are properly exhausted or waives its objection to these claims as unexhausted or procedurally defaulted:  II - B-H; V - A; V - B; VI - B (as to Petitioner's allegation that trial counsel did not properly supervise investigators during the guilt phase); VI - C (as to Petitioner's allegations that counsel in the guilt phase was ineffective because he (1) did not ask prospective jurors whether they would be willing to consider a life sentence and did not challenge any juror for cause, (2) conceded in his opening statement that Petitioner went to the victim's home to rob him, (3) did not call critical witnesses, including Anthony Johnson, Officer Gene Garten, Michael McDonald, Gary Christensen, Louis Schultz, Steven Mace, Suzette Lapine, Donald Cornell, Alex Holuka, Dr. William Brady, and Dr. Verner Spitz, (4) did not present evidence of Petitioner's low intelligence and organic brain damage, (5) did not present evidence that Petitioner was in the parking lot instead of in the victim's apartment, and (6) presented a deficient closing argument by failing to articulate a theory of the case, to explain how the evidence

---

[1] For reference to a summary list of Petitioner's claims and the general substance of each claim, the Court attaches as Exhibit A to this Opinion and Order a copy of the Table of Contents provided by Petitioner with his Second Summary of First Amended Petition (#158).

supported that theory, and to address the prosecution's case);
VIII - F (as to Petitioner's allegations that the trial court's
guilt-phase instructions on the terms "personally" and "aiding
and abetting" were constitutionally insufficient); IX - A; IX - B
(as to the *ex post facto* challenge only); X - A (to the extent
that this claim is a facial challenge to Oregon's capital-
sentencing scheme); XI - E (as to Petitioner's allegations that
penalty-phase counsel were ineffective when they (1) failed to
present evidence about Petitioner's ability to adapt to prison
life in a peaceful manner and (2) failed to object to the verdict
form that indicated the jurors verdict had to be unanimous);
XIII - A; XIII - B; XVI - B; XVII - A-C; and XXI - E.

    To the extent the State's Motion for Summary Judgment
applies to these claims, the Court denies the State's Motion.
The Court will address the merits of these claims in due course.

    For his part, Petitioner does not dispute the State's
contention that he failed to exhaust the following claims and
that they are now procedurally defaulted:  III; IV; V - E; V - F;
V - G; VI - E; VIII - A; VIII - B; VIII - D; VIII - E; IX - B
(with respect to the parts of the claim unrelated to an *ex post
facto* challenge); IX - C, X - A (to the extent it is an as
applied claim); X - D; XI - B; XI - H; XII; XIII - C; XIII - E;
XIII - F; XIV; XVI - A; and XVI - G.  The Court has reviewed the
record as to these claims and finds the State's contention they

were not fairly presented to the Oregon Courts and are now procedurally defaulted is well taken.  *See* 28 U.S.C. § 2248 ("The allegations of a return to the writ of habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true."). Exceptions to procedural default will be addressed below.

Accordingly, the Court will examine whether the following remaining claims were fairly presented to the Oregon courts and, thus, properly exhausted and/or whether they were excused from the exhaustion requirement:  I; V – C-D; VI – A-G; VII; VIII- C; VIII – F; X – B; X – C; X – E; XI – A; XI – C-G; XII – H; XIII – B; XIII – D; XIII – G; XV; XVI – C-F; XVIII; XIX – A-B; XX; XXI – A-D; XXII – A-E; and XXIII.  The Court will address these claims in a sequence in accord with Petitioner's particular argument.

I.   **FAIR PRESENTATION AND EXCEPTIONS TO EXHAUSTION**

A.   **Actual Innocence (Claims I and XVIII)**

Petitioner contends any failure to exhaust Claim I (substantive claim of actual innocence relating to his conviction) is excused on the basis that there is not a state-court forum for litigating this claim and the State is judicially estopped from contending a forum is available, any procedural rule for hearing such claim is not clear or consistently applied, or the claim was previously unavailable.  Because the Court concludes below that Petitioner cannot demonstrate he is entitled

13 - OPINION AND ORDER

to pass through the *Schlup v. Delo*, 513 U.S. 298 (1995),
procedural actual-innocence gateway to have the Court reach the
merits of his defaulted claim, the Court will not determine
whether Petitioner's substantive actual-innocence claim was
fairly presented to Oregon's state courts.  *See* 28 U.S.C. §
2248(b)(2) ("An application for writ of habeas corpus may be
denied on the merits, notwithstanding the failure of the
applicant to exhaust the remedies available in the courts of the
State.").  As Petitioner correctly acknowledges,

> [w]hile similar to the substantive claim that
> an individual is actually innocent of the
> crime for which he has been convicted,
> recognized by the Supreme Court in *Herrera v.
> Collins*, 506 U.S. 390 (1993), the *Schlup*-
> gateway requirement is less onerous, because
> it is "procedural, rather than substantive."
> *Schlup*, 513 U.S. at 313-315.

Pet'r Resp. in Opp'n to Mot. for Summ. Adjudication on
Exhaustion/Procedural Default (#117) at 8.  In order to ensure
Petitioner has been adequately heard on this issue, however, the
Court directs Petitioner to make a written showing by August 3,
2009, as to why the Court's conclusion that he is unable to
satisfy *Schlup*'s procedural gateway standard is not fatal to his
substantive actual-innocence claim and, therefore, why the Court
should not dismiss Claim I on the merits.

Petitioner makes the same arguments regarding Claim XVIII
(substantive claim of actual innocence relating to his sentence
and the jury's finding of future dangerousness).  Petitioner's

14 - OPINION AND ORDER

arguments in support of his contention that he is actually
innocent of his capital sentence do not persuade the Court that
Petitioner could pass through the *Schlup* gateway.  Because
challenges to the jury's finding of future dangerousness (a
statutory requirement for imposition of the death penalty in
Oregon) were not briefed in the context of procedural actual
innocence, however, the Court does not consider this issue in its
*Schlup* analysis.  Nevertheless, the Court defers its decision as
to whether freestanding, substantive claims of actual innocence
are cognizable in Oregon post-conviction proceedings and whether
Claim XVIII is exhausted pending submission by the parties of
further briefing when the Court addresses the merits of this
claim.  *See* 28 U.S.C. § 2248(b)(2)("An application for writ of
habeas corpus may be denied on the merits, notwithstanding the
failure of the applicant to exhaust the remedies available in the
courts of the State.").

### B.  **Prosecutorial Misconduct (Claims VII and XV)**

Petitioner contends any failure to exhaust his claims of
prosecutorial misconduct in the guilt phase (Claim VII - A-E) and
in the penalty phase (Claim XV - A-D) is excused since there is
not an available state-court remedy or forum for these claims,
there is not a clear or consistent rule sufficient to bar federal
review of these claims, and certain claims were unavailable
previously.  Petitioner asserts his prosecutorial-misconduct

claims are independent of any ineffective-assistance claims and fall into two categories:  claims based on the prosecutor's ongoing obligation to disclose evidence that is exculpatory and that could have an impact on the outcome of the guilt or penalty phase proceedings pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and claims based on the rule that a prosecutor may not obtain a conviction arising from the presentation of perjured testimony pursuant to *Mooney v. Holohan*, 294 U.S. 103, 112 (1935).  Petitioner contends the State is judicially estopped from asserting that stand-alone claims of prosecutorial misconduct in state post-conviction proceedings are procedurally barred because the State has consistently taken the position that *Palmer v. State*, 318 Or. 352 (1994), bars relief on such claims unless they are couched in terms of ineffective assistance of counsel.

The State disputes Petitioner's characterization of its position and contends

> [i]f petitioner could not reasonably have raised his claims of prosecutorial misconduct at trial or on direct appeal because the facts essential to support those claims were not available to him, he could have raised the claims in his post-conviction proceeding by alleging those circumstances and thus avoided the procedural bar in *Palmer*.

Resp't Reply at 34.

The State relies on *Brown v. Zenon*, 133 Or. App. 291 (1995), a post-*Palmer* case, to support its argument.  In *Brown*, the

16 - OPINION AND ORDER

petitioner alleged in his post-conviction petition that the prosecutor intentionally delayed filing charges against him until after his 18th birthday to avoid juvenile court jurisdiction. Contrary to Petitioner's representation at oral argument that it is not clear in *Brown* that anyone ever considered on the merits, much less granted relief on, a freestanding claim of prosecutorial misconduct, the Oregon Court of Appeals specifically noted in *Brown* that "[t]he post-conviction court found that the claim of prosecutorial misconduct was not supported by the evidence." *Id*. at 294.

Although *Brown* may be thin support for the State's position that stand-alone claims of prosecutorial misconduct are cognizable in state post-conviction proceedings, the Court is not persuaded *Palmer* altogether bars a state post-conviction court from resolving a true stand-alone claim of prosecutorial misconduct that could not have been raised at trial or on direct appeal. Moreover, the Court finds consideration of whether *Palmer* is a clear, consistent, and regularly-applied state procedural rule sufficient to bar federal review is not relevant to the determination of whether these claims may be excused from the exhaustion requirement. A federal court's examination of whether a state procedural rule is independent and adequate is triggered by the State pleading "the existence of an independent and adequate procedural ground as an affirmative defense." *King*

17 - OPINION AND ORDER

*v. A. Lamarque*, 464 F.3d 963, 966-67 (9th Cir. 2006).  Petitioner never raised these claims in state court, and, as a result, neither *Palmer* nor any other state procedural rule was ever invoked to deny them.

Nevertheless, Petitioner's prosecutorial-misconduct claims do not need to be excused from the exhaustion requirement because they are technically exhausted through Petitioner's procedural default since the time for Petitioner to return to state court to exhaust his remedies on these claims has expired.  *Smith*, 510 F.3d at 1139.  "In cases such as this, where a petitioner did not properly exhaust state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' the petitioner's claim is procedurally defaulted."  *Id.* (quoting *Coleman*, 501 U.S. at 735 n.1).  Thus, the relevant inquiry with these claims is whether the procedural default can be excused.  *See id.*  This issue is addressed below.

C.  **Deprivation of Right to a Speedy Trial (Claims XIX - A-B)**

Petitioner contends he fairly presented these speedy-trial claims in his second automatic direct appeal and argues he sufficiently exhausted the substance of these claims in his Petition for Alternative Writ of Mandamus to the Oregon Supreme Court.  The Court has carefully reviewed Petitioner's appellate brief and Petition for Alternative Writ of Mandamus.

18 - OPINION AND ORDER

Petitioner's plea for relief with regard to his speedy-trial rights is based exclusively on Oregon law.  While Petitioner characterized the handling of the right to a speedy trial under the Sixth Amendment as being analogous, he specifically noted "this case deals with [his] rights under ORS 135.760."

In the Ninth Circuit, a petitioner has not fairly presented his federal claim to a state court unless he "specifically indicated to that court that those claims were based on federal law." *Lyons v. Crawford*, 232 F.3d 666, 668 (9th Cir. 2000), *amended by* 247 F.3d 904 (9th Cir. 2001).  The federal claim must be apparent from the appellate briefs or similar papers. *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).  Accordingly, the State's contention that Claim XIX - A is procedurally defaulted is well taken.  Petitioner never challenged the trial court's refusal to grant his request for a speedy penalty trial on federal constitutional or statutory grounds in the Oregon courts.

In addition, notwithstanding the fact that Petitioner relies on his Petition for Alternative Writ of Mandamus to support his contention that he exhausted his claims arising from the alleged violations of his speedy-trial rights, he argues in Claim XIX - B that the Oregon Supreme Court's failure to maintain records of his mandamus proceedings deprives him of the right to a full and fair review of these issues before this Court.  He asserts exhaustion of these claims should be excused because he could not

19 - OPINION AND ORDER

have known before bringing his claims to federal court that the
Oregon Supreme Court had destroyed the record of his mandamus
proceedings in this capital case.  The State, however, questions
which records Petitioner believes the Oregon Supreme Court
destroyed and points out that Petitioner has submitted the record
of the mandamus proceedings.  As noted, the Court reviewed
Petitioner's submission of this record (Pet'r Ex. 39) and
compared it with the relevant OJIN report relating to
Petitioner's mandamus proceedings (Pet'r Ex. 8).  The Court,
therefore, is satisfied the record is sufficiently complete to
allow a full and fair review of these issues.  Again to ensure
Petitioner has been adequately heard, the Court directs
Petitioner to show cause by August 3, 2009 why the Court should
not deny Claim XIX - B on the merits.  *See* 28 U.S.C. §
2248(b)(2)("An application for writ of habeas corpus may be
denied on the merits, notwithstanding the failure of the
applicant to exhaust the remedies available in the courts of the
State.").

     **D.**    **Constitutionally Insufficient Automatic Appeal and
State Post-Conviction Proceedings (Claims XXI - A-D, F)**

Petitioner contends he could not have challenged the
sufficiency of Oregon's automatic appeal and state post-
conviction proceedings in the state courts because the basis for
the challenge did not exist until the conclusion of those
proceedings in June 2006.  Petitioner's claims, however, do not

20 - OPINION AND ORDER

need to be excused from the exhaustion requirement because they are technically exhausted through Petitioner's procedural default since the time for Petitioner to return to state court to exhaust his remedies on these claims has expired. *Smith*, 510 F.3d at 1139. "In cases such as this, where a petitioner did not properly exhaust state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' the petitioner's claim is procedurally defaulted." *Id.* (quoting *Coleman*, 501 U.S. at 735 n.1). Thus, the relevant inquiry as to these claims is whether the procedural default can be excused. *See id.* This issue is addressed below.

**E.    Single Presentation (V - C, XIII - D, XIII - G, and XII - H)**

Petitioner argues claims fairly presented in his first direct appeal did not have to be raised again in his second direct appeal following his penalty-phase retrial because "repetitious presentation is not required." Petitioner relies on *Humphrey v. Cady*, 405 U.S. 504, 516 n.18 (1972); *O'Sullivan v. Boerckel*, 526 U.S. 838, 846 (1999); *and Gardner v. Pitchess*, 731 F.2d 637, 639-40 (9th Cir. 1984), to support his position.

**1.    Claim V - C**

21 - OPINION AND ORDER

With regard to Petitioner's Claim V - C in which Petitioner asserts he was deprived of his right to a guilt trial before a fair, impartial, and representative jury when prospective jurors Coleman and Johnson were removed, the Court has carefully reviewed Petitioner's appellate brief on his first direct appeal.  The Court concludes regardless whether presentation of the claim in his first appeal was sufficient to exhaust the claim, Petitioner failed to raise an "as-applied challenge" to the exclusion of juror Coleman during the death-qualification process based on the United States Constitution. Accordingly, the Court finds this claim to be procedurally defaulted and will address exceptions to procedural default below.

Petitioner, however, specifically challenged the removal of juror Johnson based on federal law.  The Court finds such challenge sufficient to exhaust Claim V - C as to prospective juror Johnson only.

### 2.  <u>Claims XIII - D, XIII - G, and XIII - H</u>

As to Claims XIII - D, XIII - G and XIII - H (claims relating to the "future dangerousness" question), the Court is unpersuaded by Petitioner's contention that presentation of these claims in his first direct appeal is sufficient to exhaust them. The Oregon Supreme Court vacated Petitioner's first death sentence and remanded his case for a full re-sentencing trial.

That second penalty-phase trial necessarily superseded the first. Having been given the benefit of a totally new penalty-phase trial and subsequent direct appeal, Petitioner, through counsel, was obligated to make appropriate objections regardless whether they had been made in his first penalty-phase trial. Petitioner also was obligated on appeal to raise claims of error identified in his second penalty-phase trial. Because the as-applied claims at issue here involve evidence presented during the second penalty-phase trial as well as the actual jury instructions given in that proceeding, presentation of similar claims based on evidence presented during the first penalty-phase trial and the jury instructions given in that proceeding is not fair presentation of the subject claims that stem from an entirely different proceeding. *Humphrey*, *O'Sullivan*, and *Gardner* do not contradict this conclusion. Accordingly, Claims XIII - D, XIII - G, and XIII - H are procedurally defaulted. The Court will address below the issue of exceptions to procedural default as to these claims.

**F.**    **Identical Presentation (Claims XI - A and XXII - A-E)**

As Petitioner correctly notes,

> To fairly present his claims, a petitioner must assert the substance of his claims, including the "operative facts" and "legal principles" underlying each claim, to the state court. *Picard [v. Connor]*, 404 U.S. 270, 277-78 (1971). However, the exhaustion doctrine **does not** require a mechanical presentation of completely identical

> petitions or "an exact correlation between
> the pleading in both state and federal
> court." *Rice v. Wood*, 44 F.3d 1396, 1403
> (9th Cir. 1995), *vacated in part on other
> grounds*, 77 F.3d 1138 (9th Cir.)(*en banc*),
> *cert. denied* 519 U.S. 873 (1996); *citing
> Vasquez v. Hillery*, 474 U.S. 254, 257-258
> (1986).

Resp. in Opp'n (#117) at 2-3 (emphasis in original).

### 1.   <u>Claim XI - A</u>

Petitioner contends he fairly presented Claim XI - A (claim alleging ineffective assistance of guilt-phase counsel had a continuing prejudicial impact on his second penalty-phase trial) through the presentation of claims alleging prejudice from individual ineffective assistance of guilt-phase counsel claims. The Court disagrees.  Claim XI - A raises a distinct ground for relief separate from Petitioner's specific, fairly presented individual ineffective assistance of guilt-phase counsel claims.

On this record, the Court concludes Petitioner did not challenge the PCR court's express finding that Petitioner did not suffer prejudice in his second penalty phase as a result of his guilt phase and first penalty-phase trial.  Accordingly, the Court concludes Claim XI - A is procedurally defaulted.  The Court will address exceptions to procedural default below.

### 2.   <u>Claims XXII - A-E</u>

As to Claims XXII - A-E (claims alleging cruel and unusual punishment), the Court concludes Petitioner's cursory allegation in his first direct appeal that death by lethal injection administered by the State constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution is not sufficient to fairly present the specific Eighth and Fourteenth Amendment claims raised in his First Amended Petition relating to (1) the drugs and methods used to execute inmates, (2) the delegation of medical procedures to nonmedical personnel, (3) the secrecy of the execution procedures, (4) the length of time that Petitioner must spend on death row, and (5) the execution itself as a violation of evolving standards of decency.  Accordingly, these claims are unexhausted.[2]

## G.    **Demurrer Sufficient to Exhaust (Claims VIII - F and XVI - C-E)**

As to Claim VIII - F (claim alleging the guilt-phase jury instructions and verdict forms failed to adequately instruct the jury on critical issues and were hopelessly convoluted and confusing), Petitioner asserts his pretrial challenge to the torture murder charge on interlocutory appeal was sufficient to preserve a challenge to any jury instruction related to elements

---

[2] The State also contends these claims are not ripe for review because Petitioner may raise them at the time the death-warrant hearing is held pursuant to Or. Rev. Stat. § 137.463.

of such charge.  Similarly, as to Claims XVI - C and E (claims
alleging jury instructions defining "beyond a reasonable doubt"
and "mitigation" were constitutionally infirm) and Claim XVI - D
(claim challenging the decision of the trial court to instruct
the jury on all three sentencing options), Petitioner asserts he
adequately preserved these claims when he demurred these issues
and raised the issue of the trial court's denial of relief on
direct appeal.  The State contends Petitioner's arguments are
contrary to Oregon law and cites *State v. Pinnell*, which holds
raising an issue by demurrer does not preserve a later challenge
to jury instructions on that issue.  319 Or. 438, 443-45 (1994).

The State's position is well taken.  To exhaust these
claims, Petitioner must have taken exception to the asserted
infirmities in the jury instructions and verdict forms and
appealed any denial of relief from the trial court on that basis.
Accordingly, the Court concludes these claims are procedurally
defaulted.  The Court will address exceptions to procedural
default below.

**H.    Request for Transcript Sufficient to Exhaust
        (Claim X - C)**

In Claim X - C, Petitioner alleges failure to provide a full
transcript of *voir dire* from his second penalty-phase trial
precludes this Court from determining whether a fair, impartial,
and representative jury was impaneled in that proceeding.
Petitioner cites *Murray v. Carrier*, 477 U.S. 478, 488 (1986), to
26 - OPINION AND ORDER

support his argument that this claim was sufficiently exhausted through his repeated requests to counsel and the State for transcription of the *voir dire* proceedings.  The portion of *Murray* cited by Petitioner, however, focuses on the issue of satisfying the cause-and-prejudice exception to procedural default rather than whether alleged requests to counsel and the State for transcription of the *voir dire* proceeding adequately exhausted the subject claim.

Petitioner did not fairly present this claim to Oregon's highest court in a procedural context in which its merit was considered.  As the time for presenting such a claim has expired, the Court concludes this claim is procedurally defaulted.  As noted, the Court will address exceptions to procedural default below.

### I.    **Cumulative-Error (Claim XX)**

Petitioner raises a claim of cumulative error in Claim XX. Petitioner, however, failed to raise this claim as a federal constitutional violation in his state-court proceedings, and his assertion that he "raised numerous arguments regarding reliability previously" is not sufficient to establish exhaustion of this specific cumulative-error claim.  Cumulative error must distinctly be raised as an issue at the state level for purposes of exhaustion before seeking federal habeas review.  *See Solis v. Garcia*, 219 F.3d 922, 930 (9th Cir. 2000)(the district court

properly declined to review petitioner's cumulative-error claim when the claim was not presented during the state-court appeals).

Nevertheless, Petitioner's cumulative-error claim does not need to be excused from the exhaustion requirement because it is technically exhausted through Petitioner's procedural default since the time for Petitioner to return to state court to exhaust his remedies on this claim has expired. *Smith*, 510 F.3d at 1139. "In cases such as this, where a petitioner did not properly exhaust state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' the petitioner's claim is procedurally defaulted." *Id*. (quoting *Coleman*, 501 U.S. at 735 n.1).

Thus, the relevant inquiry as to this claim is whether the procedural default can be excused. *See id*.  Again, the Court will address exceptions to procedural default below.

**J.    Incompetency (Claim XXIII)**

Petitioner alleges in Claim XXIII that he is not competent to be executed.  He acknowledges, however, that this allegation is not ripe and is premature for federal review.  Pursuant to *Martinez-Villareal v. Stewart*, a claim of incompetency for execution "must be raised in a first habeas petition, whereupon it also must be dismissed as premature due to the automatic stay that issues when a petition is first filed." 118 F.3d 628, 634

(9th Cir. 1997), *aff'd*, 523 U.S. 637 (1998).  If presented to the
district court after the claim is ripe for review, it shall not
be treated as a second or successive petition.  *See id.* at 643-
44.  The Court, therefore, will not consider whether this claim
is exhausted at this time and dismisses Claim XXIII without
prejudice as premature.

    **K.**   **<u>Artificial Limits on Appeal from PCR Trial Court's</u>**
          **<u>Denial of Relief (Claims V - D, VI - A-G, VIII - C, X -</u>**
          **<u>B, X - E, XI - C, XI - D, XI - E, XI - F, XI - G, XIII</u>**
          **<u>- B, and XVI - F)</u>**

    Petitioner concedes he failed to raise numerous other claims
as assignments of error in his appeal to the Oregon Court of
Appeals following the PCR court's denial of relief.
Nevertheless, he contends exhaustion of these claims should be
excused due to what he asserts are artificial limits the Oregon
state courts placed on his ability to exhaust these claims.
While Petitioner asks the Court to excuse the exhaustion
requirement, the Court notes he does not argue he was prevented
from raising certain specified individual PCR claims on appeal or
that the Oregon appellate courts would not have addressed these
claims.  Instead he contends the Oregon state courts placed
"artificial" limits on his ability to exhaust all of his
potentially meritorious claims.  The Court assumes Petitioner
refers to the Oregon Court of Appeals' denial of his motion to

file an oversized brief of 225 pages and a separate oversized abstract and appendices of 150 pages.

In any event, Petitioner does not need to be excused from the exhaustion requirement for these claims because they are technically exhausted through Petitioner's procedural default due to the fact that the time has expired for Petitioner to return to state court to exhaust his remedies on claims he raised in his PCR Petition but failed to raise as assignments of error on appeal.  *Smith*, 510 F.3d at 1139.  "In cases such as this, where a petitioner did not properly exhaust state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' the petitioner's claim is procedurally defaulted."  *Id.* (quoting *Coleman*, 501 U.S. at 735 n.1).  Thus, the relevant inquiry with these claims is whether the procedural default can be excused, which will be addressed below.

## II.  FUNDAMENTAL MISCARRIAGE-OF-JUSTICE EXCEPTION TO PROCEDURAL DEFAULT/*SCHLUP*'S GATEWAY ACTUAL-INNOCENCE EXCEPTION

Petitioner argues this Court should consider the merits of all of his claims regardless of any default because he can satisfy the fundamental miscarriage-of-justice exception to procedural default.

Minor discrepancies exist between the parties' Concise Statements of Material Facts with regard to facts underlying the

30 - OPINION AND ORDER

proffered new evidence.  For the limited purpose of determining whether Petitioner can satisfy the fundamental miscarriage-of-justice exception to procedural default and for the purpose of resolving Respondent's Motion for Partial Summary Judgment, the Court considers the agreed-upon facts as presented by and in the light most favorable to Petitioner.

**A.    <u>Standards</u>**

The Supreme Court in *House v. Bell* elaborates on the test for satisfying the fundamental miscarriage-of-justice exception to procedural default:

> In *Schlup* [*v. Delo*, 513 U.S. 298 (1995)], the Court adopted a specific rule to implement this general principle.  It held that prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  513 U.S. at 327, 115 S. Ct. 851.  This formulation, *Schlup* explains, "ensures that petitioner's case is truly 'extraordinary,' while still providing petitioner a meaningful avenue by which to avoid a manifest injustice." *Ibid*. (quoting *McCleskey v. Zant*, 499 U.S. 467, 494, 111 S. Ct. 1454, 113 L.Ed.2d 517 (1991)).
>
> * * *
>
> [T]he *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence.  [Instead a] petitioner's burden at the gateway stage is to demonstrate that *more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt - or, to remove the double*

> *negative, that more likely than not any reasonable juror would have reasonable doubt.*

547 U.S. 518, 536-38 (2006)(emphasis added).

At the outset of this inquiry, Petitioner asserts he need only demonstrate it is more likely than not that "a reasonable juror" (*i.e.*, one juror) reviewing the new evidence would have had reasonable doubt as to Petitioner's guilt.  The Court disagrees and rejects Petitioner's interpretation of the principles set out in *Schlup*.  In his argument, Petitioner ignores the actual language of *Schlup* and *House* and his argument is not consistent with the Supreme Court's interpretation of *Schlup* as ensuring the fundamental miscarriage-of-justice exception is only applied in extraordinary cases.  *See House*, 547 U.S. at 538. ("[T]he *Schlup* standard is demanding and permits review only in the 'extraordinary' case.")(citing *Schlup*, 513 U.S. at 327) (quotations omitted).

To be credible, an actual-innocence claim must be supported by "new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." *Schlup*, 513 U.S. at 324.

> *Schlup* makes plain that the habeas court must consider "'all the evidence,'" old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial." *See id.*, at 327-328, 115 S. Ct. 851 (quoting Friendly, Is Innocence Irrelevant?

32 - OPINION AND ORDER

> Collateral Attack on Criminal Judgments, 38
> U. Chi. L. Rev. 142, 160 (1970)).  Based on this
> total record, the court must make "a probabilistic
> determination about what reasonable, properly
> instructed jurors would do."  513 U.S. at 329.
> The court's function is not to make an independent
> factual determination about what likely occurred,
> but rather to assess the likely impact of the
> evidence on reasonable jurors.  *Ibid*.

*House*, 547 U.S. at 538.  Thus the Court considers Petitioner's

evidentiary arguments to determine whether it is "more likely

than not . . . [that] no reasonable juror would find him guilty

beyond a reasonable doubt."

**B.  Petitioner's "New" Evidence**

Petitioner offers two categories of "new" evidence to

support his claim that he is actually innocent of aggravated

murder:  (1) evidence available at the time of trial but not

presented during his guilt-phase trial and (2) newly-discovered

evidence not available at the time of his guilt-phase trial.  The

following is in the former category:

1.  Cornell's Criminal History

Petitioner asserts the jury never heard Cornell had a

history of committing person-to-person robberies that included

hog-tying victims.

Specifically, Cornell and another person robbed and

hog-tied a Plaid Pantry clerk in August 1976 nine years before

Ruffner's murder, and Cornell robbed the same clerk two days

later and forced him to drive to another location at gunpoint.

33 - OPINION AND ORDER

Cornell pled guilty to a series of four robberies as a result of these acts.

In 1984 Cornell was convicted of another person-to-person robbery.

The State admits Cornell had a history of hog-tying victims, and the lead investigative officer at Cornell's murder trial noted hog-tying the victim of a robbery was so unique that in 15 years of experience he had only seen it done to victims of crimes involving Cornell. Despite being familiar with Petitioner's extensive criminal history, the State denies having knowledge or information as to whether Petitioner had a history of hog-tying victims before he committed crimes with Cornell.

Petitioner also asserts the jury at his trial did not hear Cornell had a history of selling stolen property and passing stolen checks. Specifically, Petitioner refers to evidence the State presented at Cornell's trial that indicated Cornell was known for his ability to sell stolen property and to cash stolen checks, Cornell personally sought to cash checks belonging to Ruffner, and Cornell possessed all of Ruffner's stolen credit cards and checks at the time of his arrest.

2.   Cornell's Connection to the Victim

Petitioner asserts the jury did not hear evidence that it was Cornell rather than Petitioner who was seen with Ruffner before his murder. Specifically, the jury did not hear evidence

34 - OPINION AND ORDER

that Suzette LaPine, Ruffner's neighbor, saw Cornell and Ruffner walking to Ruffner's apartment either the night of the murder or the night before.

The jury also did not hear evidence that Ruffner made entries for the several days before his murder in a notebook documenting contacts with men with whom he apparently engaged in sex. Those entries included the name "Don" and Cornell's first name is "Donald," but they did not include the name "Mark," which is Petitioner's first name.

### 3. Cornell's Greater Intelligence and Petitioner's Possible Legal Insanity

Petitioner contends the jury did not hear evidence that Cornell is significantly more intelligent than Petitioner or that Petitioner may have been legally insane at the time of the crime. Specifically, the jury was not given the results of psychological testing that indicated Cornell's IQ was 98 and Petitioner's IQ was 81. In addition, evidence exists that indicates Petitioner suffered from organic brain damage; was functionally illiterate; and was abusing alcohol, speed, and heroin at the time of the crime at a level that had previously caused him to undergo a psychotic decomposition. The State, however, disputes Petitioner's assertion that there was evidence he was abusing drugs at the time of the crime.

Petitioner also asserts the jury did not hear evidence that, on two previous occasions, Petitioner's abuse of drugs and

35 - OPINION AND ORDER

alcohol together with his organic brain damage rendered him
guilty but insane for his criminal conduct.  Petitioner
apparently refers to his April 4, 1974, commitment to the Oregon
State Hospital on a Criminal Court Commitment as not being
capable of understanding the burglary charges then pending
against him and as being unable to assist in his own defense and
his September 14, 1973, readmission to the Oregon State Hospital
after he was adjudged not guilty by reason of mental defect on
the burglary charges.  Pet'r Ex. 20, pp. 12 & 18.

    4.   <u>Others Were Involved in the Crimes Against Brown
and Ruffner</u>

      Petitioner contends the guilt-phase jury was not given
evidence that others, including Robert Meadows and Steve Mace,
were involved in the crimes against Brown and Ruffner.
Specifically, Brown testified at Petitioner's second penalty-
phase trial that even though he only saw two people come into his
apartment initially, others may have come in after he was
blindfolded, particularly in light of the amount of property
stolen.  In addition, Roylene Meadows testified at Petitioner's
penalty-phase retrial that she had not been truthful when she
testified at Petitioner's guilt-phase trial regarding Robert
Meadows and Mace's alibis; *i.e.*, she testified at Petitioner's
second penalty-phase trial that they did not return to the house
until much later than she had testified to previously.  The Court
notes her testimony on this issue at Petitioner's second penalty-

36 - OPINION AND ORDER

phase trial was corroborated by the testimony of Diane Brown, Roylene's houseguest.

     5.   <u>Ruffner's Death was Accidental</u>

     Petitioner contends the jury did not receive the medical evidence from the State's own medical expert that Ruffner's death was accidental rather than the result of torture. Specifically, the jury did not hear the testimony of Larry Lewman, M.D., that the wad of tissue placed in Ruffner's mouth may have worked its way into his throat and blocked his airway accidentally rather than that the tissue was intentionally shoved into the back of his throat; that once Ruffner's airway was occluded, he would have become unconscious within 20-30 seconds and would have died in minutes; that having the airway totally blocked would not by itself result in "intense physical pain"; that even though the blow to Ruffner's head tore his ear and caused bruising on his scalp, it did not result in a skull fracture or visible brain injury and most likely did not cause Ruffner to lose consciousness; and that Dr. Lewman would not characterize the pain resulting from the defensive wounds that Ruffner received as "intense physical pain." Although Dr. Lewman testified at the trials of both Petitioner and Cornell, the Court notes this described evidence was only presented at Cornell's trial.

6.   <u>Evidence Rebutting Varzali's Testimony</u>

Petitioner also asserts the jury did not hear evidence that rebutted the testimony of the State's primary witness, Velma Varzali.  Specifically, although Suzette LaPine, who did not have a role in the crime, testified she saw Ruffner and Cornell together, additional witnesses, including Lloyd Cornell, asserted Varzali admitted to them that she did not have any knowledge of the crime against Ruffner.

In addition, Petitioner contends the following evidence, which was not available at the time of his guilt-phase trial, also supports his claim of actual innocence:

7.   <u>Cornell's Statements to the Oregon Board of Parole and Post-Prison Supervision</u>

Petitioner asserts Cornell's statements to the Oregon Parole Board in 2002, 2004, and 2006 in which he confessed that he was responsible for Ruffner's death, that he had tied Ruffner up, and that Ruffner accidently suffocated as a result proves Petitioner is actually innocent of aggravated murder.  Although Cornell denied he intentionally killed Ruffner, he admitted he tied up and robbed a different victim (presumably Brown) ten days before Ruffner's death.

The State responds to Petitioner's assertions by enumerating the following evidence that it believes establishes Petitioner's guilt beyond a reasonable doubt, contradicts Petitioner's suggestion that his proffered "new evidence"

38 - OPINION AND ORDER

establishes Cornell alone committed the acts that resulted in
Ruffner's death, and contradicts Petitioner's suggestion that his
proffered "new evidence" establishes Ruffner's death was an
accident:

8.   Petitioner's Involvement in the Brown Crime

   a.   Randy Brown testified both Petitioner and
        another man participated in tying him up and
        gagging him.

   b.   A Yamhill County corrections officer
        testified Petitioner told him the most he
        could be convicted of in the Brown crime was
        possession of stolen property.  Petitioner
        allegedly stated, "I didn't rob nobody, but I
        sure lit his ass up".

   c.   Robert Meadows testified Petitioner and
        Cornell came to his house on September 9,
        1985, and asked for a pistol, rope, and use
        of Meadows's truck.  Meadows testified he
        gave them a hunting knife.

   d.   Mace testified he drove Petitioner and
        Cornell to the vicinity of Brown's house on
        September 9, 1985; several hours later he saw
        Petitioner driving Brown's truck full of
        household items; and Petitioner and Cornell
        talked about the robbery stating they tied
        Brown up, put his truck in the garage, and
        loaded it up.

   e.   Petitioner pled guilty to First Degree
        Robbery for his crimes against Brown.

9.   Petitioner's Involvement in Ruffner's Murder

   a.   Meadows testified Petitioner was looking
        through *Swing N Sway* magazine after the Brown
        robbery and before the Ruffner murder and
        said, "[H]ere is one that has a VCR."

   b.   Varzali testified she was with Petitioner and
        Cornell when they drove to Ruffner's

apartment; Petitioner entered the apartment
first, and Cornell followed five minutes
later; Cornell came back to the car three
hours later and drove it around to the front
of the apartment to load it with property
sitting on the sidewalk and more property
from upstairs; Cornell was nervous, upset,
and angry with Petitioner, and Petitioner was
in a good mood; she thought they had been
partying; that Petitioner had been perspiring
or had taken a shower; Petitioner said "[H]e
went for the ear, but [Cornell] had gotten
their [*sic*] first"; Park Eldridge, the
State's investigator, told her that
Petitioner had admitted to the murder and
told him that Varzali drove the car that
night; and Eldridge told her that Petitioner
said "he would go ahead and plead guilty to
just a murder beef . . . , but Washington
County wanted to try him for aggravated
murder, and he wasn't going for [it]."

c.     John Thomas, a former police officer,
       testified he went into the living room area
       after discovering Ruffner's body and
       confirming he was dead and found a black
       table lamp tipped over with a small piece of
       white cord left on it after the remainder had
       been ripped off.  The stub of cord matched
       the cord used to truss Ruffner.

d.     Petitioner's fingerprints were found on two
       different lamps seized from Ruffner's
       apartment, an Automobile Club card in
       Ruffner's name, and a March 1985 issue of
       *Swingers* magazine and volume of *Stag*
       magazine.

e.     Thomas Jenkins, a criminalist with the Oregon
       State Police, testified the cords used to tie
       Ruffner came from items in the apartment.  He
       further testified the cord from a dark-
       colored lamp had the same general charac-
       teristics and was consistent in size and
       shape as a cord used to truss Ruffner.
       Finally, he testified a knit cap found in the
       apartment contained head hair from a

Caucasian that was consistent with
Petitioner's head hair.

f.    Robert and Roylene Meadows testified
      Petitioner, Cornell, and Varzali came to
      their house on the morning of September 19,
      1985, and showed them a stack of credit
      cards--one with an eagle hologram for which
      Roylene testified Petitioner told her that he
      did not need a PIN.  At trial Roylene
      identified four of Ruffner's credit cards as
      those Petitioner had shown her on the morning
      of September 19, 1985.

g.    At trial the parties stipulated that Michelle
      Sturgis would identify Petitioner as the
      person who tried to pass a check belonging to
      Ruffner at Fred Meyer.  Joy Brady testified
      she cashed one such check for $275.  Brady
      testified Petitioner told her the check was
      good and gave her $70 after she cashed it.

h.    Jenkins testified the wad of tissue found
      lodged in Ruffner's throat was bigger than
      a golf ball and smaller than a baseball.
      Dr. Lewman testified Ruffner probably only
      lived a few minutes after he was bound and
      gagged (a scarf was tied tightly around his
      mouth over the three-inch wad of tissue) and
      that the wad of tissue and ligatures
      contributed to his death.

i.    When he was arrested, Petitioner kissed
      Cornell on the lips and begged him not to
      tell police he had been driving the car in
      the driveway.  Petitioner told his ex-wife,
      Dixie Timmons, to ditch the TV.  Varzali
      identified the portable TV set that
      Petitioner brought to Timmons's house as the
      one taken from Ruffner's apartment.

Reply to Pet'r Resp. in Opp'n to Mot. for Summ. Adjudication on

Exhaustion/Procedural Default (#138) at 15-21.

41 - OPINION AND ORDER

C.  **Analysis**

As a preliminary matter, the parties disagree as to whether the State had to prove under Oregon law that Petitioner personally and intentionally caused Ruffner's death in order to convict him of aggravated murder.  The State asserts that only the two charges of Aggravated Felony Murder pursuant to Oregon Revised Statute § 165.095(2)(d) require the State to prove Petitioner personally and intentionally caused Ruffner's death. The State notes the Oregon Supreme Court approved an instruction defining "personally" in *State v. Nefstad* that is identical to the instruction given in Petitioner's case.

> Personally in the context of aggravated murder
> means that to be guilty of that crime the
> Defendant must have had an actual role in causing
> the death and not merely a role in the felony
> during which the death occurred.

309 Or. 523, 541 (1990).

The Oregon Supreme Court recently revisited this jury instruction in *State v. Link*, No. SC S055516, 2009 WL 1230544 (Or. May 7, 2009).  Petitioner contends the court in *Link* rejected the argument the State makes that it did not need to prove Petitioner was responsible for the actual physical acts that led to Ruffner's death in order to prove Petitioner acted "personally" so as to be guilty of aggravated felony murder.  In *Link*, the court rejected the State's position that any time a defendant has an "actual role in causing the death," he commits

42 - OPINION AND ORDER

the murder personally.  *Id.*, at *13.  Instead, the court held the
State must prove the defendant performed the physical act of
homicide himself.  The court specifically noted, however, in
accord with the conclusions in *Nefstad*, that the State did not
have to prove the defendant acted alone or that the homicide had
to be a solitary physical act or limited to the final fatal act:

> As in *Nefstad*, people acting together each
> may "personally * * * commit[]" the physical
> act of homicide.  And as in *Nefstad*, it may
> take a confluence of physical acts to
> effectuate the act of homicide.

*Id.,* at *15.

Though there was evidence the defendant in *Link* took part in
murder preparations and encouraged and directed others to shoot
the victim, it was undisputed he was not physically present when
the victim was shot.  In that case where "the act of homicide was
one act--the act of shooting--committed by one person[-not the
defendant,]" the court held the defendant could not have
committed the act personally, either individually or by
controlling the shooter.  *Id.*, at *15.[3]  Notably too, the court
in *Link* directed trial courts to refrain from using the *Nefstad*
instruction defining "personally" in the future because it did

---

[3] The court left open the question of whether a defendant
personally commits an act if the defendant exercises such complete
control over another that the other functions as the defendant's
instrumentality.  *Id.*, at *15.

43 - OPINION AND ORDER

not inform the jury the State must prove that a defendant performed the physical act of homicide himself. *Id*. at *15 n.12.

Notwithstanding the Oregon Supreme Court's clarification of the definition of "personally" in the context of aggravated felony murder and its directive that trial courts refrain from using the jury instruction given in *Nefstad* in the future, the facts here are distinguishable from those presented in *Link*. As was the case in *Nefstad*, it took a "confluence of physical acts to effectuate th[is] act of homicide;" namely, hogtying Ruffner, shoving a wad of tissue in his mouth, gagging him, and tying a ligature around his neck. Moreover, unlike the facts in *Link* where it was undisputed the defendant was not physically present when the victim was shot, there was evidence in this case from which a reasonable juror could find Petitioner was involved in the physical act of homicide himself. Specifically, a jury could find Petitioner's participation in all aspects of the Brown crime (including tying up the victim), fingerprint evidence at the Ruffner crime scene (specifically petitioner's fingerprints on a dark colored lamp from which the cord had been ripped and which resembled the cord used to truss Ruffner), and witness testimony established Petitioner's involvement in physically overcoming and killing Ruffner.

According to Petitioner, however, he was, at most, a participant in the robbery when Ruffner was accidently killed

44 - OPINION AND ORDER

and, thus, he contends a fair review of all of the evidence supports, at worst, a conviction for felony murder.  The Court disagrees.  Even if the State was required to prove that Petitioner had to act personally, as now defined in *Link*, and intentionally in causing Ruffner's death, a review of all of the evidence does not lead the Court to conclude that, having reviewed the same evidence, no reasonable juror would be persuaded Petitioner was guilty of aggravated murder beyond a reasonable doubt.

Even though the proffered new evidence could persuade a reasonable juror to render a different verdict after considering the totality of the evidence, this does not satisfy Petitioner's burden under *Schlup*.  Evidence of Cornell's history of hog-tying, his history of selling stolen property, his link to the victim, and his recent admissions in parole hearings is potentially significant when considered in the context of all of the evidence.  Petitioner's argument that he at most participated in robbing Ruffner, however, is just that--an argument--and it does not compel the conclusion that no reasonable juror would have found that he personally and intentionally committed the acts responsible for Ruffner's death.  In fact, as already noted, evidence of Petitioner's participation in all aspects of the Brown crime (including tying up the victim), fingerprint evidence at the Ruffner crime scene, and witness testimony that

45 - OPINION AND ORDER

establishes Petitioner's involvement in physically overcoming
Ruffner would support a reasonable juror's determination that
Petitioner was guilty of aggravated murder.

Similarly, the Court notes it is possible that the testimony
given by Dr. Lewman at Cornell's trial, which Petitioner cites as
supporting his contention that there was insufficient evidence in
his guilt-phase trial as to torture and that Ruffner's death was
accidental, may have persuaded some jurors to render a different
verdict on the aggravated-murder-by-torture count.  Such
testimony, however, is not evidence of innocence so compelling
that, in view of all of the evidence, it is more likely than not
that no reasonable juror would have convicted Petitioner on that
count, let alone any count of aggravated murder.

In summary, even though the evidence presented at the trials
of Petitioner and Cornell was primarily the same, Petitioner
emphasizes Cornell's jury returned a verdict of felony murder
after they also heard evidence attacking Varzali's credibility,
evidence of Cornell's repeated denials of any involvement in the
crime (which Cornell's jury clearly rejected), and the additional
evidence from Dr. Lewman.  Thus, Petitioner maintains a jury
hearing all of the evidence presented at Cornell's trial as well
as the additional evidence that Petitioner presents here in
support of his claim of actual innocence would have returned a
similar verdict.

46 - OPINION AND ORDER

Again, while the evidence proffered by Petitioner could have persuaded a reasonable juror to determine that Petitioner was not guilty of Aggravated Murder, that evidence is insufficient to show it is more likely than not that no reasonable juror examining such evidence would have convicted Petitioner beyond a reasonable doubt.  This is due in part to the fact that the evidence at issue is not qualitatively on par with the exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that points to a petitioner's actual innocence as discussed in *Schlup*.  Instead the confluence of the circumstantial evidence here merely supports somewhat plausible inferences relating to the map of circumstances surrounding the Brown crime and Ruffner's death.

The Court notes the cases Petitioner emphasizes to support his claim of actual innocence actually underscore the reasons he cannot pass through the *Schlup* gateway.  For example, in *Carriger v. Stewart*, the court found the physical evidence of guilt was not strong and the prosecution relied principally on the testimony of Robert Dunbar given in exchange for immunity.  132 F.3d 463, 466 (9th Cir. 1997).  Significantly, the new evidence offered in support of Carriger's claim of actual innocence included Dunbar's confession under oath that he rather than Carriger had committed the crime; testimony that Dunbar boasted to family and friends that he had set Carriger up; and Dunbar's

47 - OPINION AND ORDER

long history of violence, lying to police, and trying to pin his crimes on others, which was known to state authorities.  *Id*. at 478-79.  These facts are qualitatively quite different from the facts at issue here.

Petitioner also contends even if a jury would have convicted him of aggravated murder after being properly instructed and having heard all of the new evidence, it, nevertheless, is more than probable that no reasonable juror would have sentenced him to death under the capital-sentencing scheme in effect at the time of his penalty-phase retrial.  In other words, Petitioner argues no reasonable juror would sentence him to death after being presented with all of the available evidence, including evidence that Cornell, now admitting to conduct leading to Ruffner's death, was convicted of felony murder and is set to be released this year.

Under the capital-sentencing scheme in effect at the time of Petitioner's second penalty-phase trial, a jury considering imposition of the death penalty had to answer four questions:

> The first question asked by the law is:  Was the conduct of the defendant that caused the death of Ruffner committed deliberately and with the reasonable expectation that the death of Ruffner would result?

> The second question asked by the law is:  Is there a probability - meaning is more likely than not - that the defendant would commit criminal acts of violence that would constitute a threat to society?

48 - OPINION AND ORDER

> The third question asked by the law is:  Was the conduct of defendant in killing Ruffner unreasonable in respect to the provocation, if any, by Ruffner?
>
> The fourth question asked by the law is:  Should the defendant receive a death sentence?

Or. Rev. Stat. § 163.150(1)(b)(A-D).

The Court agrees it is plausible that a reasonable juror, presented with evidence that Petitioner's co-defendant, who was convicted of felony murder, was equally or even more culpable and yet is scheduled to walk free this year, might answer "no" to the fourth question on the basis that it is unfair for the two defendants to receive such disparate sentences.  The miscarriage-of-justice exception, however, applies in the capital-sentencing context only when a petitioner shows "'by clear and convincing evidence' that no reasonable juror would have found him eligible for the death penalty." *Calderon v. Thompson*, 523 U.S. 538, 559-60 (1998).

Although, Petitioner implies fairness or proportionality of sentencing among similarly culpable co-defendants is the sort of evidence of actual innocence of a death sentence contemplated by *Schlup*, the Court does not find any support for this proposition. Moreover, the Court is unpersuaded that proportionality of sentencing among co-defendants, while arguably relevant and admissible as mitigation evidence at a capital penalty-phase trial, bears on the question of whether an individual defendant

49 - OPINION AND ORDER

is eligible for the death penalty.  Accordingly, the Court
concludes Petitioner has failed to demonstrate by clear and
convincing evidence that no reasonable juror, after convicting
him of aggravated murder, would find him eligible for the death
penalty.

    For these reasons, the Court concludes Petitioner has failed
to satisfy *Schlup*'s "fundamental miscarriage of justice"
exception.  Accordingly, Petitioner has not overcome the
procedural bars preventing federal habeas review of his defaulted
claims on this basis.

### III. <u>CAUSE-AND-PREJUDICE EXCEPTION TO PROCEDURAL DEFAULT</u>

    Petitioner also asserts a combination of the following
constitutes cause sufficient to excuse any procedural default of
his claims:  (1) lack of a sufficient record due to a state
system that relies on trial counsel to identify issues on appeal
and to create the record on appeal; (2) the Oregon Court of
Appeals' refusal to allow PCR appellate counsel to exhaust claims
due to artificial page limits placed on briefing and the court's
failure to recognize exhaustion for purposes of presenting claims
on federal habeas review as one of its functions; (3)
constitutionally inadequate direct proceedings due to Oregon's
failure to appoint qualified trial and appellate counsel in those
proceedings and ineffective assistance of counsel when the state
does appoint an attorney; (4) constitutionally inadequate PCR

50 - OPINION AND ORDER

proceedings due to Oregon's failure to appoint qualified trial
and appellate counsel in those proceedings and ineffective
assistance of counsel when the state does appoint an attorney,
and failure to adequately fund the PCR process; (5) failure of
state law enforcement and prosecutors to provide exculpatory
evidence; and (6) prosecutorial misconduct based on reliance on
perjured testimony to obtain a conviction.

Moreover, Petitioner contends prejudice is demonstrated (1)
by the fact that after twenty-plus years in state court, he comes
to federal court with only a handful of exhausted, nondefaulted
claims and (2) by the merits of the claims in question as set
forth in his First Amended Petition (#85).

A.    **Standards**

The procedural default doctrine and its attendant
"cause and prejudice" standard are "grounded in
concerns of comity and federalism," *Coleman v.
Thompson*, 501 U.S. 722, 730, 111 S. Ct. 2546, 115
L. Ed. 2d 640 (1991), and apply alike whether the
default in question occurred at trial, on appeal,
or on state collateral attack, *Murray v. Carrier*,
477 U.S. 478, 490-492, 106 S. Ct 2639, 91 L. Ed.
2d 397 (1986).  "[A] habeas petitioner who has
failed to meet the State's procedural requirements
for presenting his federal claims has deprived the
state courts of an opportunity to address those
claims in the first instance."  *Coleman*, 501 U.S.
at 732, 111 S. Ct 2546.  We therefore require a
prisoner to demonstrate cause for his state-court
default of *any* federal claim, and prejudice
therefrom, before the federal habeas court will
consider the merits of that claim.  *Id*. at 750,
111 S. Ct. 2546.

*Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).

In order to establish cause for a procedural default, "a petitioner must demonstrate that the default is due to an external objective factor that cannot fairly be attributed to him." *Smith*, 510 F.3d 1127, 1146.

> The courts have recognized several general categories of claims that constitute cause for a procedural default. In *Murray*, the Supreme Court gave as one example of cause 'some interference by officials [that] made compliance [with procedural rules] impracticable." 477 U.S. at 488, 106 S. Ct. 2639 (citation omitted). In *Francis v. Rison*, 894 F.2d 353, 355 (9th Cir. 1990), we held that prison officials' interference with a petitioner's access to administrative remedies can be cause for a procedural default.
>
> Constitutionally ineffective assistance of counsel has also been considered cause for a procedural default. *See Murray*, 477 U.S. at 488, 106 S. Ct. 2639. However, there is no constitutional right to an attorney in state post-conviction proceedings. *See Coleman*, 501 U.S. at 752, 111 S. Ct. 2546. Therefore, any ineffectiveness of [a petitioner's] attorney in the post-conviction process is not considered cause for the purpose of excusing the procedural default at that stage. *See id; see also Ortiz v. Stewart*, 149 F.3d 923, 933 (9th Cir. 1998)(ineffective representation in post-conviction proceeding does not constitute cause for procedural default).
>
> The Eighth Circuit has recognized another form of cause for procedural default-where a petitioner is represented by an attorney who has an actual conflict of interest. *See Jamison v. Lockhart*, 975 F.2d 1377, 1379 (8th Cir. 1992)(where petitioner relied on counsel "whose loyalty was tainted by conflict of interest," petitioner asserted cause for a procedural default). In the Eighth Circuit, an attorney's conflict of interest may be cause for a procedural default regardless of whether the petitioner has a valid claim of ineffective assistance of counsel. *See Joubert v. Hopkins*, 75 F.3d 1232, 1243 (8th Cir. 1996)

> ("Interference by the state, ineffective
> assistance of counsel, and conflicts of interest
> are examples of factors external to the defense
> which prevent a petitioner from developing the
> factual basis of his claim")(emphasis added).

*Manning v. Foster*, 224 F.3d 1129, 1133 (9th Cir. 2000).  In

*Manning*, the Ninth Circuit concluded an omission committed by an

attorney acting under a conflict of interest may constitute cause

to excuse procedural default even in the absence of a Sixth

Amendment violation.  *Id*. at 1135.

Rule 8 of the Rules Governing Section 2254 cases provides:

"[T]he judge, must review the answer, any transcripts . . .

[,the] record of state-court proceedings," and the expanded

record, if any, "to determine whether an evidentiary hearing is

warranted."  The State asserts it is an open question in this

Circuit whether the diligence requirements under 28 U.S.C.

§ 2254(e)(2) apply to evidentiary hearings relating to procedural

default.  The Court notes the Ninth Circuit did not discuss

diligence in *Loveland v. Hatcher*, 231 F.3d 640, 644-45 (9th Cir.

2000), when it determined an evidentiary hearing was appropriate

to resolve the issue as to whether the petitioner could prove

cause to excuse procedural default.  At oral argument, the State

conceded it would not be an abuse of discretion for the Court to

hold an evidentiary hearing on these issues.

**B.**  <u>**Cause**</u>

      1.   <u>Lack of a Sufficient Record Due to State System</u>
<u>which Relies on Trial Counsel to Identify Issues</u>
<u>on Appeal and to Create the Record on Appeal</u>

      Petitioner contends Oregon's process for creating the
record of a capital case on appeal is a facially deficient one in
that it relies on trial counsel to identify issues on appeal and
to create the record on appeal.  He asserts this system is
deficient because trial counsel has an inherent conflict in
creating a record that will be the basis for reviewing his
performance and because counsel may not be able to perceive his
own errors.  Pet'r Mem. in Supp. of Mot. for Evidentiary Hr'g
(#121) at 11 (citing *Halbert v. Michigan*, 545 U.S. 605, 620 n.5
(2005)).  Petitioner also argues the inadequacy of the record in
his case is evidenced by numerous missing documents including
(1) the transcript of a waiver hearing or proceeding,
(2) Petitioner's motion to file in *pro se* to exhaust, (3) purged
trial exhibits, and (4) a complete transcript of the voir-dire
proceedings from his second penalty-phase trial.[4]  According to
Petitioner, Oregon's deficient process "stands in stark contrast
to the procedures utilized by every other state in the Ninth

_____

    [4] These are the documents discussed by Petitioner in his
Motion for an Evidentiary Hearing and addressed by the Court.  The
Court, however, notes Petitioner alleges in his First Amended
Petition (#85) that some 295 documents are missing.  The State has
since supplied a number of these missing documents; *e.g.*, alleged
missing correspondence between Ray Bassel and the State's counsel.
Resp't Ex. 271.

54 - OPINION AND ORDER

Circuit."  He asserts the other states require automatic
transcription and inclusion in the record on appeal of all oral
hearings and pre-trial and trial proceedings and do not leave
such decisions to trial counsel's discretion as Oregon does.

In particular, Petitioner points to gaps in the record
in his own case and contends such gaps are the result of Oregon's
faulty system.  He argues this incomplete record constitutes
state interference with his ability to exhaust his claims and
creates a conflict of interest for the attorney, which are both
possible causes for procedural default.  Petitioner's arguments
notwithstanding, he does not offer any support for the
proposition that Oregon's system for identifying issues on appeal
or creating the record on appeal equates with the sort of state
interference or "actual" attorney conflict of interest that
constitutes cause as contemplated by *Manning*.

In *Manning*, the petitioner alleged he failed to exhaust
state-court remedies by seeking post-conviction relief because
his attorney, who apparently missed the direct appeal filing
deadline, erroneously led him to believe his only post-conviction
option was to move for reconsideration of his sentence.  The
court found a clear conflict between petitioner's interest in
presenting and prevailing in his ineffective-assistance claim and
the attorney's interest in protecting himself from damage to his
professional reputation and exposure to a possible malpractice

55 - OPINION AND ORDER

liability or bar discipline.  *Id*. at 1134.  Notably, an actual, as opposed to a theoretical, conflict of interest was identified in that case.

Here Petitioner does not offer any authority for the proposition that a *per se* conflict of interest arises between petitioners in Oregon and their counsel sufficient to constitute cause merely because Oregon's system for creating the record on appeal differs from those of the other Ninth Circuit states and perhaps results in a less comprehensive record.  In the absence of such authority, the Court declines to infer as a matter of law that a conflict of interest with counsel is inherent in the difference of Oregon's system and the fact of a missing document. Instead, Petitioner must identify an actual conflict of interest between himself and his counsel, such as the one detailed in *Manning,* before the Court can determine whether cause exists sufficient to excuse procedural default.

Nevertheless, in an effort to determine whether the absence of the documents identified in Petitioner's Motion for an Evidentiary Hearing could have interfered with Petitioner's ability to exhaust some or all of his claims, the Court considers possible ramifications of their absence.

a.   Record of Waiver Hearing

On this record, it is clear such a hearing involved Petitioner's waiver of his right to later challenge

56 - OPINION AND ORDER

appointment of Christopher Burris, guilt-phase trial counsel, based on the relationship between counsel and counsel's wife, a deputy district attorney in Washington County, which is the county in which Petitioner's Aggravated Murder charges were pending.  Although Petitioner contends he waived his ability to raise all ineffective assistance of counsel claims in that hearing, the Court notes he actually raised more than thirty claims of ineffective assistance of trial counsel relating to Burris' representation of him in his PCR Petition.  Thus, there is not any basis to conclude the absence of this record had any meaningful impact on Petitioner's ability to exhaust some or all of his claims.  Accordingly, the Court denies Petitioner's Motion for an Evidentiary Hearing to support his contention that he can demonstrate cause for any procedural default on this basis.

        b.   Record of Motion to File in Pro Se to Exhaust

        If Petitioner presented such a motion to the state courts specifically identifying certain claims he wished to present in that forum and that his counsel refused to raise, the question whether he can satisfy the cause standard to excuse procedural default of those claims would be a closer one.  Accordingly, the Court directs Petitioner to submit a brief by August 3, 2009, describing the evidence he proposes to offer (if the Court conducts an evidentiary hearing) for the purpose of supporting this contention, including proof that such motion ever

existed and was submitted to the state courts and proof that Petitioner sought to raise certain defaulted claims that he is now trying to raise before the Court.

c.  Purged Exhibits

The State contends Petitioner's allegations regarding the Marion County Circuit Court's purging of Petitioner's post-conviction exhibits fail as a matter of proof. The Court agrees.  Petitioner does not present any evidence that he did not have access to copies of the exhibits in his own file or that the State interfered with his then-appointed counsel's ability to obtain them.  More importantly, Petitioner is precluded from contending that he did not have knowledge of the content of these exhibits and, therefore, could not have raised claims relating to their substance in light of the fact that he admitted these very exhibits at his PCR trial and referenced many of them on appeal from the PCR trial court's denial of relief.

As noted, for cause to exist, the external impediment must have prevented Petitioner from raising the claim. *See McClesky*, 499 at 497-98.  Merely because a petitioner did not have physical possession of exhibits he submitted during PCR proceedings is not evidence that the petitioner was prevented from developing a factual or legal basis for his claims.  Thus, Petitioner fails to demonstrate Marion County Court's purging of

these exhibits amounts to cause for procedural default. Accordingly, the Court denies Petitioner's Motion on this basis.

                d.    Missing Transcript of Voir Dire Proceedings

                Petitioner alleges he repeatedly sought transcription of these proceedings from both his counsel and the State.  If this is true, he may be able to satisfy the cause standard on this basis.  The Court notes this is a critical transcript and finds it troubling that a complete transcript of this proceeding is missing.  Accordingly, the Court directs Petitioner to submit a brief by August 3, 2009, describing the evidence that he intends to submit in support of this contention (if the Court conducts an evidentiary hearing), including proof that he made requests to his counsel and the State for a copy of this transcript.

                For all these reasons, the Court DENIES Petitioner's Motion for an Evidentiary Hearing as to development of cause and prejudice through all of the documents identified by Petitioner with the exception of those documents related to his Motion to Proceed Pro Se and his requests for transcription of his second penalty-phase voir-dire proceedings.  As to these documents, the Court will further consider Petitioner's Motion for an Evidentiary Hearing upon receipt of the supplemental briefs ordered herein.

59 - OPINION AND ORDER

2.    <u>Oregon Court of Appeals' Refusal to Allow PCR
      Appellate Counsel to Exhaust Claims Due to
      Artificial Page Limits Placed on Briefing</u>

Petitioner contends he should be excused from
exhausting a number of claims that he raised in his PCR petition
but was prevented from raising on appeal due to the Oregon Court
of Appeal's denial of his motion to file an expanded 225-page
brief and the court's failure to recognize exhaustion of claims
for federal presentation as a function of state appellate and
post-conviction proceedings.[5] Petitioner suggests the 150-page
limit imposed by the Oregon Court of Appeals was itself an
objective factor external to the defense that impeded his effort
to present his claims to the state courts.  The Court is
unpersuaded by this argument.  While the page limit may have
limited the extent of counsel's arguments, the Court disagrees it
limited his ability to present his claims at all.  The 150-page
limit imposed by the Oregon Court of Appeals is reasonable and
generous.  The Court notes Petitioner did not submit a proposed
225-page brief for that court's review demonstrating the
necessity of a brief of this length.  Moreover, Petitioner fails
to show that the page limit prevented him from bringing certain
claims over others nor that the page limit led to more than
counsel making certain strategic choices regarding the arguments

---

[5] The Oregon Court of Appeals denied Petitioner's Motion but
allowed him 150 pages, which is three times the statutory 50-page
limit.

to include or to omit.  *See Weeks v. Angelone*, 176 F.3d 249, 272 (4th Cir. 1999).

According to Petitioner, Oregon courts "simply do not consider allowing a petitioner to exhaust claims for presentation to a federal court to be a purpose of state court appellate and post-conviction proceedings."  Even if this were an accurate characterization of the Oregon Court of Appeals' disposition toward page limits, and there is not any evidence that it is, the state courts, nonetheless, have an obligation to address federal constitutional claims independent of any future federal habeas litigation.

The Court is satisfied on this record that further evidentiary development is unnecessary to resolve this issue. The Court concludes the page limit imposed by the Oregon Court of Appeals on Petitioner's post-conviction appellate brief does not constitute cause to excuse procedural default of claims raised in Petitioner's PCR petition but not pursued on appeal.

3. <u>Constitutionally Inadequate Direct Proceedings Due to Oregon's Failure to Appoint Qualified Trial and Direct Appellate Counsel and Due to Ineffective Assistance of the Counsel Appointed to Represent Petitioner during those Proceedings</u>

Petitioner alleges counsel appointed by the State to represent him at trial and in his direct appeals were unqualified and these counsel rendered ineffective assistance.  Referring to the historical problem with attracting competent, qualified

61 - OPINION AND ORDER

counsel for capital cases on appeal and in post-conviction proceedings generally, Petitioner contends in Oregon there is not any appropriate training or review of qualifications of capital counsel at any stage nor adequate funding of the capital state bar.  Presumably Petitioner would seek to develop additional evidence in an evidentiary hearing related to Oregon's capital system generally and the qualifications and experience of Petitioner's trial and direct appellate counsel specifically.

For the following reasons, the Court declines to grant Petitioner's Motion for an Evidentiary Hearing on this basis. The Ninth Circuit has held an ineffective assistance of counsel claim cannot be based solely on counsel's inexperience.  While "'[t]he character of a particular lawyer's experience may shed light on an evaluation of his actual performance, it does not justify a presumption of ineffectiveness in the absence of such an evaluation.'"  *Ortiz v. Stewart*, 149 F.3d 923, 933 (9th Cir. 1998)(quoting *United States v. Cronic*, 466 U.S. 648, 665 (1984)). This reasoning underscores the principle that this Court must examine counsel's actual performance to discern whether Petitioner's Sixth Amendment right to counsel has been adequately preserved.  Moreover, even assuming ineffective assistance of trial and direct appellate counsel for failing to preserve and raise certain now-defaulted claims, Petitioner had a state-court, post-conviction remedy to raise such claims and failed to do so.

62 - OPINION AND ORDER

He needed to pursue that remedy in order for such ineffectiveness
to constitute cause for default.  *See Edwards, 529 U.S. at 451.*
Petitioner is not free to bypass this obligation by reframing
claims of ineffective assistance as an allegation of State
interference.

        4.    <u>Constitutionally Inadequate PCR proceedings due to
Oregon's Failure to Appoint Qualified PCR Counsel
and Ineffective Assistance of the Counsel
Appointed to Represent Petitioner during those
Proceedings</u>

As noted, Petitioner also contends none of his state-
appointed counsel had any experience or training in capital
appeals or PCR proceedings.  He asserts Ralph Smith, his PCR
trial counsel, not only lacked capital PCR experience, he did not
have any PCR experience and had never filed a civil pleading
before being assigned Petitioner's case.  Pet'r Mem. in Supp. of
Mot. for Evidentiary Hr'g (#121) at 13.

Petitioner asserts "[w]hen state direct appeal and
post-conviction procedures fail to provide for, and fund, the
development and litigation of all arguably meritorious challenges
to a capital sentence, those procedures 'create an objectively
deficient standard' for state capital proceedings." *Ashmus v.
Calderon*, 31 F. Supp. 2d 1175, 1189 n.27 (N.D. Cal. 1998), aff'd,
*Ashmus v. Woodford*, 202 F.3d 1160 (9th Cir.), cert. denied,
*Woodford v. Ashmus*, 121 S. Ct. 274 (2000); *See also Coleman v.
Ignacio*, 164 F.R.D. 679, 684 (D. Nev. 1996)(failure to appoint

63 - OPINION AND ORDER

competent, conflict-free counsel on first habeas proceeding in
which the defendant could raise challenges to conviction
constituted cause and prejudice sufficient to excuse default).

The Court has reviewed *Ashmus* and *Coleman* and finds
them distinguishable and, therefore, unhelpful to Petitioner.
The court in *Ashmus* addressed the specific question whether
Chapter 154 of the Antiterrorism and Effective Death Penalty Act
of 1996 (AEDPA), 28 U.S.C. §§ 2261-2266, (provisions related to
expedited habeas review and other substantive benefits available
to states that qualifiy to "opt in") applied in that case.  The
court did not address the question whether state direct appeal
and post-conviction procedures were so inadequate as to amount to
state interference with a petitioner's ability to exhaust his
claims in state court.[6]

Similarly, the facts in *Ignacio* are distinguishable
from the facts here because in that case state procedure
foreclosed a direct appeal of the petitioner's conviction.  164
F.R.D. at 680.  Indeed, in its examination of Ninth Circuit
precedent on the issue of the right to counsel in collateral
proceedings the *Ignacio* court acknowledged "there is no right to
counsel in a state collateral proceeding, even when that

_____

[6] Petitioner's reference to *Ashmus* actually highlights the
difference between the heightened state standards for providing a
mechanism for competent representation of indigent capital
prisoners required under Chapter 154's voluntary "opt in"
procedures and the constitutional floor at issue in this case.

64 - OPINION AND ORDER

proceeding is the first forum in which an indigent may challenge
the effectiveness of counsel." *Id*. at 684 (citing *Bonin v.
Vasquez*, 999 F.2d 425 (9th Cir. 1993), and *Jeffers v. Lewis*, 68
F.3d 299 (9th Cir. 1995)).

At the core, Petitioner's arguments regarding his
appointed counsels' qualifications and experience constitute
ineffective assistance of PCR trial and appellate counsel claims
reframed as an allegation of state interference.  Petitioner,
nonetheless, contends *Coleman* "left open the viability of an
ineffective assistance of counsel claim at the trial level of a
post-conviction case . . . if that was the first available method
for raising challenges to a conviction or sentence."  The Ninth
Circuit, however, has held

> [b]ecause there is no constitutional right to an
> attorney in state post-conviction proceedings,"
> *Coleman*, 501 U.S. at 752, 111 S. Ct. 2546,
> attorney ineffectiveness "in the post-conviction
> process is not considered cause for purposes of
> excusing the procedural default at that stage,"
> *Manning*, 224 F.3d at 1133.  As the Supreme Court
> has established, counsel acts as the petitioner's
> agent and thus any attorney error in post-
> conviction proceedings is generally attributable
> to the petitioner himself.  *See Coleman*, 501 U.S.
> at 752-53, 111 S. Ct. 2546.

*Smith*, 510 F.3d at 1146-47.  Although Petitioner acknowledges the
*Smith* court holds ineffective assistance of counsel at the post-
conviction trial stage cannot constitute "cause," he preserves
his right to argue that *Coleman* does not provide a blanket

65 - OPINION AND ORDER

prohibition in the context of a capital case arising in Oregon or in connection with the failings noted in the Oregon system.

Because Petitioner did not have a constitutional right to post-conviction counsel, questions surrounding the sufficiency of his PCR trial and appellate counsels' performance or the adequacy of funding of Oregon's post-conviction process are constitutionally irrelevant here.  Neither argument constitutes cause to overcome a procedural default.

Accordingly, the court denies Petitioner's Motion for Evidentiary Hearing for the purpose of developing this issue.

        5.    Failure of Police Officers and Prosecutors to
              Disclose Exculpatory Evidence

With regard to Petitioner's assertions alleging law enforcement and/or prosecutors failed to disclose exculpatory evidence, Petitioner contends he could not exhaust these claims because he did have the information necessary to do so, there was not a state-court remedy available, and it would have been futile to do so.  Petitioner does not, however, allege facts that demonstrate the State prevented him from raising these claims in a successive post-conviction petition after he discovered the allegedly exculpatory information.  Thus, Petitioner does not satisfy the cause standard necessary to overcome the procedural default of these claims.  Accordingly, Petitioner's Motion for Evidentiary Hearing to develop this issue is denied.

66 - OPINION AND ORDER

6. <u>Prosecutorial Misconduct Based on Reliance on Perjured Testimony</u>

These prosecutorial misconduct claims are based on evidence presented during Petitioner's guilt and penalty-phase trials. Petitioner does not allege facts demonstrating the State prevented him from raising these record-based claims on direct appeal from his second penalty-phase trial. Again, he does not satisfy the cause standard necessary to overcome the procedural default of these claims. Accordingly, Petitioner's Motion for Evidentiary Hearing to develop this issue is denied.


<u>**CONCLUSION**</u>

For these reasons, the Court **GRANTS in part** and **DENIES in part** Respondent's Motion (#108) for Partial Summary Judgment on exhaustion/procedural default grounds, **DENIES in part** Petitioner's Motion (#120) for Evidentiary Hearing on the adequacy of state-court process and the existence of state-created impediments, directs further briefing from Petitioner as to his Motion for Evidentiary Hearing as herein described, and rules as follows:

1. The Court will address the following claims on their merits in due course:

   a.   II - B-H;
   b.   V - A;
   c.   V - B;


67 - OPINION AND ORDER

    d.    VI - B (as to Petitioner's allegation that trial counsel did not properly supervise investigators during the guilt phase);

    e.    VI - C (as to Petitioner's allegations that counsel in the guilt phase was ineffective because he (1) did not ask prospective jurors whether they would be willing to consider a life sentence and did not challenge any juror for cause, (2) conceded in his opening statement that Petitioner went to the victim's home to rob him, (3) did not call critical witnesses, including Anthony Johnson, Officer Gene Garten, Michael McDonald, Gary Christensen, Louis Schultz, Steven Mace, Suzette Lapine, Donald Cornell, Alex Holuka, Dr. William Brady, and Dr. Verner Spitz, (4) did not present evidence of Petitioner's low intelligence and organic brain damage, (5) did not present evidence that Petitioner was in the parking lot instead of in the victim's apartment, and (6) presented a deficient closing argument by failing to articulate a theory of the case, to explain how the evidence supported that theory, and to address the prosecution's case);

    f.    VIII - F (as to Petitioner's allegations that the trial court's guilt-phase instructions on the terms "personally" and "aiding and abetting" were constitutionally insufficient);

    g.    IX - A;

    h.    IX - B (as to the *ex post facto* challenge only);

    i.    X - A (to the extent this claim is a facial challenge to Oregon's capital-sentencing scheme);

    j.    XI - E (as to Petitioner's allegations that penalty-phase counsel were ineffective when they (1) failed to present evidence about Petitioner's ability to adapt to prison life in a peaceful manner and (2) failed to object to the verdict form that indicated the jurors verdict had to be unanimous);

    k.    XIII - A;

    l.    XIII - B;

    m.    XVI - B;

    n.    XVII - A-C; and

    o.    XXI - E.

To the extent the State's Motion for Partial Summary Judgment applies to these claims, the Court **DENIES** the State's Motion.

2.    Petitioner has failed to satisfy *Schlup*'s "fundamental
      miscarriage of justice" exception to procedural default
      either as to conviction or sentence.

3.    The Court directs Petitioner to show cause by August 3,
      2009, why the Court's conclusion that he cannot satisfy
      *Schlup*'s gateway standard is not fatal to his
      substantive actual innocence claim relating to
      conviction (Claim I).

4.    The Court directs the parties to brief the merits of
      Claim XVIII in due course. The Court defers
      consideration of whether freestanding, substantive
      claims of actual innocence are cognizable in Oregon
      post-conviction proceedings pending review of the
      merits of this claim.

5.    The Court directs Petitioner to show cause by August 3,
      2009, why the Court, given its related findings, should
      not deny Claim XIX - B on the merits.

6.    The Court will address the merits of Claim V - C (as to
      prospective juror Johnson only) in due course.

7.    Claim XXIII (prophylactic incompetency claim) is
      dismissed without prejudice as premature.

8.    The Court directs Petitioner to submit supplemental
      briefing in support of his Motion for Evidentiary
      Hearing describing the evidence on which he relies to
      satisfy the cause-and-prejudice exception to procedural
      default through evidence relating to a Motion to File
      in Pro Se to Exhaust and evidence relating to his
      requests for a transcript of his second penalty-phase
      voir-dire proceedings.  The Court further directs
      Petitioner to submit a memorandum by August 3, 2009,
      specifically outlining the evidence he will be
      presenting to support his contentions.

9.    Respondent may file a supplemental memorandum in
      response to Petitioner's supplemental briefing by
      September 4, 2009, when the Court will take these
      remaining matters related to Petitioner's Motion for
      Evidentiary Hearing under advisement again.

10.   The Court **DENIES** Petitioner's Motion for Evidentiary
      Hearing (#120) on all other grounds.

**IT IS SO ORDERED.**

DATED this __26th__ day of June, 2009.


                              _____/s/ Anna J. Brown_____
                              ANNA J. BROWN
                              United States District Judge


70 - OPINION AND ORDER