**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

MARK ALLEN PINNELL,                          3:06-cv-00828-BR

        Petitioner,                        OPINION AND ORDER

v.

BRIAN BELLEQUE, Warden,

        Respondent.


TERESA A. HAMPTON
Federal Defender Services of Idaho
Capital Habeas Unit
702 W. Idaho, Suite 900
Boise, ID 83702
(208) 331-5530

        Attorney for Petitioner

ELLEN F. ROSENBLUM
Oregon Attorney General
CAROLYN ALEXANDER
TIMOTHY A. SYLWESTER
Assistant Attorneys General
Department of Justice
Appellate Division
1162 Court Street N.E
Salem, OR 97301
(503) 378-4402

        Attorneys for Respondent


1 - OPINION AND ORDER

**BROWN, Judge.**

The parties' briefing is complete on the limited issues as to whether Petitioner can establish prejudice due to the missing portion of the Second Penalty-Phase *Voir Dire* Transcript and whether he can establish cause and prejudice to excuse procedural default of certain claims of ineffective assistance of trial counsel pursuant to *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). For the reasons that follow, the Court **DISMISSES without prejudice** certain defaulted claims as specified herein and will address other specified claims on the merits in due course.

<u>STANDARDS</u>

I.    <u>Missing Transcript</u>

In *Jackson v. Renico*, 179 F. App'x 249, 252 (6th Cir. 2006), the Sixth Circuit Court of Appeals explored the issue of missing trial transcripts in depth.  The court reasoned as follows:

> Although the Supreme Court has held that the due
> process clause is violated if an indigent
> defendant is denied a transcript, *Griffin v.
> Illinois*, 351 U.S. 12, 76 S. Ct. 585, 100 L. Ed.
> [__] 891 (1956)(plurality opinion), that a state
> may not block an indigent petty offender's access
> to an appeal afforded others, *Mayer v. Chicago*,
> 404 U.S. 189, 195-96, 92 S. Ct. 410, 30
> L. Ed. 2d 372 (1971), and that a new court-appointed
> attorney who represents an indigent [defendant] on
> appeal (but not at trial) is entitled to the entire
> transcript at public expense, *Hardy v. United States*,
> 375 U.S. 277, 279-80, 84 S. Ct. 424, 11 L. Ed. 2d 331
> (1964), it has never held that the absence of a portion

of a trial transcript automatically entitles the defendant to a retrial. In fact, in *Mayer*, the Supreme Court acknowledged that a "complete" record did not necessarily require a verbatim transcript, so long as the state found another means of providing an adequate record. *Mayer*, 404 U.S. at 194, 92 S. Ct. 410. In other words, "*Mayer* does not stand for the proposition, implicit in [Jackson's] argument, that where a portion of a trial transcript is missing and unobtainable, and where a defendant makes a claim that could possibly implicate that portion of the transcript, a retrial is always necessary." *Scott v. Elo*, 302 F.3d 598, 604 (6th Cir. 2002)(rejecting that the failure to transcribe a significant portion of the closing argument denied the petitioner due process).

This Court has held that federal habeas relief based on a missing transcript will only be granted where the petitioner can show prejudice. *Bransford v. Brown*, 806 F.2d 83, 86 (6th Cir. 1986). In *Bransford*, as in this case, this Court considered whether the unavailability of transcripts of jury instructions was a per se violation of due process. The trial court in that case had determined that the transcript of the instructions was irretrievable. The petitioner made no specific allegation of error, however. The Court held that there was no per se violation of prejudice, and stated that a petitioner "must show prejudice resulting from the missing transcripts." *Id*. at 86. The Court added that "[a]lthough this court recognizes the inherent difficulty in demonstrating prejudice where the transcripts are missing, petitioner must present something more than gross speculation that the transcripts were requisite to a fair appeal." *Id*.

Similarly, the Ninth Circuit has held a petitioner has the burden of establishing prejudice from the lack of a complete transcript in light of the alleged value of the transcript and the availability of alternatives that would fulfill the same functions. *Madera v. Risley*, 885 F.2d 646, 648-49 (9th Cir.

1989).  *See also United States v. Wilson*, 16 F.3d 1027, 1031 (9th Cir. 1994 (when the court reporter failed to record all proceedings verbatim, the defendant had to demonstrate that specific prejudice resulted in order to obtain reversal).

## II.  **"Cause and Prejudice" under *Martinez v. Ryan***

A habeas petitioner does not have a federal constitutional right to the effective assistance of counsel during state post-conviction proceedings.  *Pennsylvania v. Finley*, 481 U.S. 551 (1987).  *See also Bonin v. Vasquez*, 999 F.2d 425, 430 (9th Cir. 1993).  As a result, the general rule is that any errors of counsel during a post-conviction action cannot serve as a basis for cause to excuse a procedural default.  *Coleman v. Thompson*, 501 U.S. 722, 752 (1991).

In *Martinez* the Supreme Court established a limited exception to the general rule that applies only to Sixth Amendment claims of ineffective assistance of counsel. The Court held as a matter of equity that inadequate assistance of post-conviction counsel or lack of counsel "at initial-review collateral review proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."  132 S. Ct. at 1315.  In *Nguyen v. Curry* the Ninth Circuit found the *Martinez* holding included claims of

ineffective assistance of direct-appeal counsel.[1]  736 F.3d 1287,
1293 (9th Cir. 2013), In *Trevino v. Thaler* the Supreme Court held
as follows:

> We consequently read *Coleman* as containing an
> exception, allowing a federal habeas court to find
> "cause," thereby excusing a defendant's procedural
> default, where (1) the claim of "ineffective
> assistance of trial counsel" was a "substantial"
> claim; (2) the "cause" consisted of there being
> "no counsel" or only "ineffective" counsel during
> the state collateral review proceeding; (3) the
> state collateral review proceeding was the
> "initial" review proceeding in respect to the
> "ineffective-assistance-of-trial-counsel claim";
> and (4) state law requires that an "ineffective
> assistance of trial counsel [claim] . . . be
> raised in an initial-review collateral
> proceeding."

133 S. Ct. 1911, 1918 (2013)(citing *Martinez*, 132 S. Ct. at 1318-
19, 1320-21)(alterations in original)).

### A.    Prong One: Substantiality of Underlying Claim of Ineffective Assistance of Counsel

For the *Martinez* exception to apply a petitioner must bring
forward facts that demonstrate his underlying claim of
ineffective assistance of counsel is substantial.  The United
States Supreme Court has defined "substantial" as a claim that

---

[1] The Court notes in its December 2012 Order [#313] that it
specifically ruled *Martinez* was limited to claims of ineffective
assistance of *trial* counsel and "Petitioner's alleged ineffective
assistance of post-conviction counsel cannot serve as cause to
excuse the default of his ineffective assistance of direct
appellate counsel."  Because *Martinez* involves an equitable
rather than a constitutional doctrine, however, it is up to the
parties to seek reexamination of the Court's Order in light of
*Nguyen*.

"has some merit." *Martinez*, 132 S. Ct. at 1318 (comparing the substantiality question with the standard for certification of appealability set out in *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). Stated inversely, a claim is "*in*substantial" if "it does not have any merit or . . . is wholly without factual support." *Id*. at 1319. Determining whether a claim of ineffective assistance of counsel is substantial requires a federal court to examine the claim under *Strickland v. Washington*, 466 U.S. 668 (1984).

The Supreme Court has established a two-part test to determine whether a petitioner has received ineffective assistance of counsel. First, the petitioner must show his lawyer's performance fell below an objective standard of reasonableness. *Id*. at 686-87. Due to the difficulties in evaluating counsel's performance, courts must operate under a strong presumption that counsel's conduct falls within the "wide range of reasonable professional assistance." *Id*. at 689. Second, the petitioner must show his lawyer's performance prejudiced the defense. The appropriate test for prejudice is whether the defendant can show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial. *Id*. at 696.

These standards from *Strickland* for determining deficient performance and prejudice are the same standards for an eventual review of the merits of the underlying claim of ineffective assistance of counsel.  The issue whether a claim of ineffective assistance is substantial under *Martinez*, however, is not the same as a merits review.  Instead it is more akin to a preliminary review of a *Strickland* claim for purposes of determining whether a certificate of appealability should issue. *Martinez*, 132 S. Ct. at 1318-19.  A court, therefore, may conclude a claim is substantial when a petitioner has shown resolution of the merits of the *Strickland* claim would be "debatable amongst jurists of reason" or that the issues presented are "adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 336 (internal quotes omitted). Thus, to determine whether a claim is substantial, *Martinez* requires the district court to review (but not to decide) whether trial or direct appellate counsel's acts or omissions resulted in deficient performance with a reasonable probability of prejudice. Under *Martinez* the district court determines only whether the issues are sufficiently deserving to encourage further examination and whether resolution of the merits of the claim would be debatable among jurists of reason.

**B.    Prong Two:  Lack of PCR Counsel or Ineffective Assistance of PCR Counsel**

In addition to showing that the underlying claim of ineffective assistance of counsel is substantial, a petitioner seeking to invoke *Martinez* also must show either that he did not have counsel on the initial post-conviction review (PCR) or that his PCR counsel was "ineffective under the standards of *Strickland*."  132 S. Ct. at 1318.  *See also Trevino*, 133 S. Ct. at 1918.  If the PCR "attorney in the initial-review collateral proceeding did not perform below constitutional standards," his or her error does not constitute "cause."  132 S. Ct. at 1319. Thus, any error or omission by the petitioner's PCR counsel will not satisfy the "deficient performance" standard under *Martinez*. Moreover, PCR counsel "is not necessarily ineffective for failing to raise even a nonfrivolous claim."  *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012).

If PCR counsel's performance is deficient, then the court must consider whether that performance was prejudicial under *Strickland*.  *See Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014).  In other words, the *Strickland* standards for analyzing deficient performance apply with equal force to PCR counsel in the context of a *Martinez* argument.  Even if a petitioner shows his ineffective-assistance claims are substantial under the first *Martinez* prong, he still must show that post-conviction counsel

rendered deficient performance and, "but for post-conviction counsel's failure to raise [the substantial ineffective assistance] claims, there is a reasonable probability that the result of the post-conviction proceeding would have been different" under the second prong. *Id.* at 378. At times these two inquiries will collapse into one. *Id.* at 382 ("Under the circumstances of this case, if [the petitioner] succeeds in demonstrating that he was prejudiced by the failure of his post-conviction counsel, he will necessarily have established that there is at least 'some merit' to his claim that he suffered ineffective assistance of counsel at resentencing.").

The court may address either inquiry first, and resolution of one prong may obviate the need to address the other. *See Martinez*, 132 S. Ct. at 1319 ("When faced with the question whether there is cause for an apparent default, a State may answer the ineffective-assistance-of-trial-counsel claim is insubstantial, *i.e.*, it does not have any merit or it is wholly without factual support, or the attorney in the initial-review collateral proceeding did not perform below constitutional standards.").

**C.    Prongs Three and Four:  Initial PCR Proceeding and
State Law Requiring Claims of Ineffective Assistance of
Counsel To Be Brought in Initial Review Collateral
Proceeding**

The third prong (establishing the *Martinez* exception applies
only to lack of counsel or ineffectiveness of counsel in the
initial post-conviction review proceeding) and the fourth prong
(establishing state law must require claims of ineffective
assistance of counsel to be brought in an initial-review
collateral proceeding rather than on direct appeal) are rarely in
dispute and are not at issue here.  With the exception of Claims
VI.F and VI.G, which are claims of trial-court error pertaining
to the validity of Petitioner's waiver of Christopher Burris's
alleged deficient representation, Petitioner's claims involve
allegations that initial PCR counsel was ineffective for failing
to raise certain claims of ineffective assistance by guilt-phase
and second penalty-phase trial counsel.  Moreover, the fourth
prong of *Martinez* applies in Oregon because under Oregon law the
initial PCR proceeding is the first forum in which a petitioner
may claim ineffective assistance of counsel based on matters
outside of the record.

## DISCUSSION

I.   **Prejudice Arising From Missing Portion of Second Penalty-Phase _Voir Dire_ Transcript**

Petitioner concedes the Court cannot presume prejudice based solely on the fact that a portion of the second penalty-phase _voir dire_ transcript is missing.  Nevertheless, Petitioner asserts:  (1) It is evident that the transcript is not sufficiently complete to allow for a constitutionally fair review of Petitioner's death sentence and (2) a review of the available partial transcript reveals counsel rendered constitutionally ineffective assistance during _voir dire_ and Petitioner was prejudiced by this because one or more "substantially impaired" jurors sat on his jury.  Petitioner maintains he has presented "evidence of specific incidents indicating bias among seated jurors."  Petitioner's Br. [#330] at 17.

Respondent argues the record does not even support an inference that any seated jurors were biased in favor of the death penalty.  To the contrary, Respondent maintains the record reflects the seated jurors for whom there is not an available _voir dire_ transcript would listen to the facts of the case, would be reluctant to impose a death sentence, and would not impose a death sentence if the evidence did not support it.  In addition, Respondent insists the record reflects counsel appropriately used _voir dire_ to educate the jury about the requirements under the

11 - OPINION AND ORDER

law to impose a death sentence, secured each juror's agreement that he or she would impose a life sentence if the evidence did not support the findings required under the law to impose death beyond a reasonable doubt, appropriately used peremptory challenges, and knew how to use a "for cause" challenge.

In summary, Respondent states on this record that Petitioner cannot even support an inference that any jurors with a "death bias" were seated on the jury, and, therefore, Petitioner cannot establish he suffered prejudice based on the missing portion of the *voir dire* transcript that requires the Court to excuse his default of any related claims.

A.    **Death-Penalty Jurors and "Substantial Impairment"**

"A juror in a capital case is appropriately excluded where 'the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Gentry v. Sinclair*, 705 F.3d 884, 912 (9th Cir. 2013)(quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)(internal quotation omitted)).  A juror's personal objection or belief that the death penalty is wrong is an insufficient ground to exclude the juror for cause as long as the juror states he or she can set aside this objection and/or belief.  *See Lockhart v. McCree*, 476 U.S. 162, 176 (1986). "Although it is impermissible to exclude a juror who is not substantially impaired, a juror's bias does not have to be proven

with 'unmistakable clarity.'"  *Gentry*, 705 F.3d at 912 (citing *Witt*, 469 U.S. at 424).

Here Petitioner seeks to show that one or more substantially impaired jurors were seated on his jury.  He attempts to prove this primarily by comparing the answers in the pre-*voir dire* juror questionnaires of several seated jurors for whom there is not an available *voir dire* transcript ("the no *voir dire* jurors") to the questionnaire answers of potential juror Edward Bolger, who it appears the State dismissed via peremptory challenge.[2]

Petitioner argues Bolger "was an example of a juror whose answers evidenced substantial impairment and *voir dire* indicated he was subject to challenge for cause."  For example, in his questionnaire Bolger answered "don't know" when he was asked whether he held some view of the criminal law that would impair his ability to be fair and impartial and "not sure" when asked whether a verdict in the guilt phase would make him strongly inclined to impose a death sentence.  In Question 38[3] Bolger disagreed our society would be stronger if the death penalty were

_____

[2] Petitioner indicates defense counsel used one of its peremptory challenges to strike Bolger.  Petitioner's Br. [#330] at 22 n.6; Ex. 125.  From the Court's review of the record, however, it appears the State actually used one of its own peremptory challenges to excuse Bolger.  Tr. of Proceedings [#231](Voir Dire, Mar. 19, 1992) at 95.

[3] In Question 38 potential jurors were asked to rank statements intended to describe their personal beliefs about the death penalty.  Jurors had the option to strongly agree, agree, disagree, or strongly disagree with a given statement.

13 - OPINION AND ORDER

imposed more often, strongly agreed he personally is in favor of capital punishment, and agreed he could vote for the death sentence in some cases if he were on a jury.  Bolger also strongly disagreed most murders ought to receive the death penalty or murder is murder and understanding motives and circumstances are not important.  The Court notes these responses to Question 38 in and of themselves do not support a conclusion that Bolger was substantially impaired within the meaning of *Witt*.  During *voir dire*, however, Bolger confirmed he believed in capital punishment and appeared intent on advising the Court and counsel that he was leaning prematurely toward a death sentence:

> Q.  Well, the purpose of this hearing is for you to hear those things so that you can decide if death penalty, true life in prison, or life with the possibility of parole after 30 years?
>
> [Bolger].  I understand what you are just saying, and if I'm put on, I will do what I can.  But I still want you to know my personal feelings right now before I hear any of the arguments pro or con -- that's my -- that's my stand as of right now.
>
> * * *
>
> I mean, but, by golly, my feeling is that -- well, it's a very crude feeling -- very crude -- but it's just a personal thought.  That's one less person to care for in our prison if capital punishment is given and [ ] the person or the situation is proven beyond a reasonable doubt -- and that's what I hear all the time -- guilty -- that's my thinking.

Significantly, the Court called a bench conference in the midst of defense counsel's questioning of Bolger.  Following this unrecorded conference, defense counsel asked only two more

14 - OPINION AND ORDER

questions and then passed Bolger for cause.  The State declined
to ask Bolger *any* questions and also passed for cause.
Thereafter, as noted, it appears the State exercised one of its
peremptory challenges to excuse Bolger.

Petitioner maintains the similar questionnaire answers of
some of the no *voir dire* jurors and Bolger indicate one or more
of the seated jurors exhibited the same substantial impairment as
Bolger.  Thus, Petitioner contends his counsel rendered
ineffective assistance in failing to move to dismiss those
substantially-impaired jurors for cause.  In addition, Petitioner
contends a review of the available transcripts reveals counsel
also rendered constitutionally deficient assistance in their *voir
dire* questioning of other jurors (including Bolger), which
supports a conclusion that counsel would have been similarly
deficient in their questioning of the no *voir dire* jurors.
According to Petitioner, it is likely, therefore, that one or
more impaired jurors were seated on Petitioner's jury.
Petitioner further maintains the similarity between the responses
of Bolger and the responses of no *voir dire* jurors Kathryn
Baxter, Rhonda Davis, Joan Mulder, and David Muralt on their
questionnaires provides the "modicum of evidence"[4] necessary to

---

[4] *See Bransford*, 806 F.2d at 87 (concluding "even if counsel
could have obtained the transcripts, we have before us not even a
modicum of evidence that the transcripts would have revealed
reversible error.").  *See also Moore v. Carlton*, 74 F.3d 689, 693
(6th Cir. 1996)(claim fails when "there is not even a modicum of

conclude that a transcript of those jurors' responses in *voir dire* would have revealed they were impaired like Bolger, that Petitioner's counsel failed to detect such impairment and to move to have the jurors removed for cause, and that impaired jurors were seated on his jury as a result.

### 1.   Kathryn Baxter

Baxter, like Bolger, indicated she was unsure whether her opinions about the criminal law would impair her ability to be fair and impartial.[5]

Petitioner further compares the responses of Baxter and Bolger to Question 38 and concludes Baxter "presents as a juror with a clear bias towards imposing death."  In Question 38 Baxter agreed our society would be stronger if the death penalty were imposed more often, she personally is in favor of capital punishment, and she could vote for the death sentence in some cases if she were on a jury.  Baxter disagreed most murders ought to receive the death penalty and strongly disagreed murder is murder and understanding motives and circumstances are not important.

Baxter was undecided about the death penalty and stated it would depend on the case.  She also stated whether she would

evidence here that the incomplete transcript resulted in actual prejudice.").

[5] Notably, Baxter stated the question was too vague.

be strongly inclined to impose death would depend on the case. In answering "no" to a question asking whether she would vote against the death penalty because of her beliefs regardless of the evidence presented and the Court's instructions, Baxter stated:  "No -- I would look at the facts presented and decide from there."

### 2.  Rhonda Davis

Davis expressed her view that certain crimes warranted the death penalty.  According to Petitioner, Davis's answers to Question 38 show her views were "considerably similar" to Bolger's views and constitute evidence of her substantial impairment.  In Question 38 Davis agreed she personally is in favor of capital punishment and that she could vote for the death sentence in some cases if she were on a jury.  Davis disagreed most murders ought to receive the death penalty and strongly disagreed murder is murder and understanding motives and circumstances are not important.

Davis further stated "[c]ertain crimes should be considered for the death penalty, but the proof <u>must</u> be absolute with <u>no</u> room for question or doubt" (emphasis in exhibit).  In Question 57F Davis disagreed with the statement that "individuals should be held responsible for their actions regardless of what their intentions were when they took those actions" because she said it left "no room for fairness or human understanding."

17 - OPINION AND ORDER

### 3. <u>Joan Mulder</u>

Mulder expressed her view that the death penalty was justified in certain circumstances:  "In extreme cases I believe the death penalty is justified -- repeated violent offenses when the accused appears incorrigible and continues to pose a threat to society."  According to Petitioner, a comparison of the answers to Question 38 by Mulder and Bolger reveals they held similar opinions about the death penalty.  In Question 38 Mulder disagreed our society would be stronger if the death penalty were imposed more often, but she agreed she personally is in favor of capital punishment and could vote for the death sentence in some cases if she were on a jury.  Mulder disagreed most murders ought to receive the death penalty and strongly disagreed murder is murder and understanding motives and circumstances are not important.

### 4. <u>David Muralt</u>

Muralt indicated he thought the death penalty was appropriate in some, even "many," cases.  Like Bolger, he expressed uncertainty whether he as a juror would be "strongly inclined" to render a verdict resulting in a death sentence if he found a defendant guilty of murder.  In response to Question 37, which asked whether a potential juror who was personally opposed to the death penalty could still abide by Oregon law, follow the

court's instructions, and consider imposition of a death sentence
fairly in particular circumstances, Muralt stated:

> If you do not believe in the death penalty how
> could you be asked to even consider it?  I don't
> believe a juror could abide by the law of the
> State of Oregon if he didn't believe in the laws
> of our Great State of Oregon.

Petitioner notes Muralt's responses were nearly identical to
Bolger's responses.  In Question 38 Muralt disagreed our society
would be stronger if the death penalty were imposed more often,
strongly agreed he personally is in favor of capital punishment,
and agreed he could vote for the death sentence in some cases if
he were on a jury.  Muralt disagreed most murders ought to
receive the death penalty and strongly disagreed murder is murder
and understanding motives and circumstances are not important.

Muralt gave a lengthy response to Question 57F in which
he was asked whether he agreed or disagreed with the view that
individuals should be held responsible for their actions
regardless of their intentions when they took those actions.
Muralt circled "Agree," but he inserted:  "In some cases I would"
with an arrow in front of "Agree."  He explained:

> I believe that we should be held responsible for
> what we do, but if we didn't do it on purpose we
> shouldn't be penalized sever[ely].  example = if a
> smoker burned a house down because some ashes fell
> on the carpet when he's been smoking = there was
> not intent to burn the house down right?  But if
> he got out & his wife and kids were burned up, I
> believe the personal grief that he would go
> thr[ough] would be plenty.

19 - OPINION AND ORDER

> Also if a hunter shot a deer or elk & the bullet glazed off a rock and killed someone. = That is an accident No penalty should be placed on the man.
>
> But if someone plotted for a long time to kill someone & did it, there should definitely be a severe penalty.  He shouldn't get away with that.

According to Petitioner, Muralt's view in favor of the death penalty is even more fixed than Bolger's view.  Petitioner asserts Muralt's responses to the juror questionnaire indicate he would find the death penalty appropriate for any intentional murder.  Accordingly, Petitioner maintains Muralt's responses indicate his substantial impairment within the meaning of *Witt*. Without access to the *voir dire* transcript to see how counsel dealt with Muralt's questionnaire responses, Petitioner asserts at the very least he has not been afforded constitutionally sufficient appellate review.

### B. Counsel's *Voir Dire* Performance

In further support of his prejudice argument, Petitioner asserts counsel did not understand the distinctions between noncapital and capital-jury selection.  In support of his assertion Petitioner refers to the fact that counsel spent just 14.77 hours or 1% of the time on *voir dire* research in the penalty-phase only trial.  In addition, Petitioner notes the part of counsel's pretrial brief that is devoted to *voir dire* did not make any reference to "impaired jurors automatically imposing death."

20 - OPINION AND ORDER

Petitioner further argues a review of the available portion of the *voir dire* transcript reveals counsel failed to ask clarifying questions of jurors or to move to exclude jurors for cause in violation of Petitioner's Sixth Amendment right to counsel.  For example, in questioning Brossard, Petitioner faults counsel for taking what amounted to fifteen pages of transcript to get to his first death-penalty question, and then counsel only delved superficially into the subject.  Petitioner maintains if counsel had explored the jurors' questionnaire responses during *voir dire,* their biases to impose a death sentence and their inability to abide by their oath and instructions would have been exposed.  Petitioner suggests counsel's questions were confusing and constituted an unfocused strategy without a reasonable basis in law or in fact.  Finally, Petitioner asserts counsel's use of peremptory challenges to excuse other impaired jurors highlights the fact that counsel did not recognize the jurors were impaired and that they should have been removed for cause.  Petitioner maintains counsel's use of peremptory challenges cannot cure counsel's failure to recognize that other seated jurors provided answers on *voir dire* indicating substantial impairment.

At the heart of Petitioner's argument is his assertion that counsel acted deficiently in their use of the juror questionnaires, particularly in failing to recognize and to explore responses such as those in Muralt's questionnaire.

21 - OPINION AND ORDER

These arguments notwithstanding, the record belies Petitioner's assertion that counsel would not have recognized or explored the suspect questionnaire responses during their questioning of the no *voir dire* jurors.

As a preliminary matter, Petitioner attempts to demonstrate prejudice by suggesting that the similarity between the answers to Question 38 by certain no *voir dire* jurors and Bolger necessarily means the specific views on the death penalty of those no *voir dire* jurors would have been similar to the views of Bolger for purposes of determining their fitness to serve on the jury. The Court, however, concludes Petitioner is engaging in gross speculation. As noted, Bolger's responses to Question 38 were not in and of themselves indicative of impairment, so the fact that the no *voir dire* jurors gave similar answers on this question does not raise impairment concerns. To suggest other jurors shared Bolger's seemingly inflexible, premature bias in favor of imposing death in Petitioner's case is not supported by logic or the record even though those jurors may have been firm proponents of capital punishment and confident that they could impose a death sentence if warranted. Instead the Court concludes after careful review of the *voir dire* transcript that is available, particularly with regard to defense counsel's references to and exploration of potential jurors' questionnaire responses, that it is more likely counsel questioned the jurors

22 - OPINION AND ORDER

who were eventually seated as to concerns about their responses
in their questionnaires and were satisfied those jurors were
capable of honoring their oaths and following the Court's
instructions.

Although the Court is cognizant of Petitioner's dilemma in
trying to show prejudice without support of the complete
transcript, the Court concludes on this record that Petitioner
has not met his burden to demonstrate by more than gross
speculation that he was prejudiced.  The record in fact, supports
an inference that the no *voir dire* jurors were not substantially
impaired based on their representations in the juror
questionnaires that they would follow the law and the Court's
instructions.  *See* Responses to Question 37:  Davis ("The oath we
took states we will uphold Oregon laws, not our own opinions.");
Muralt ("I don't believe a juror could abide by the law of the
State of Oregon if he didn't believe in the laws of our great
State of Oregon.");[6] Mulder ("I would hope to do my best to be
fair and conscientious in any decision."); Baxter ("Yes - again
it would depend on the situation.").  Furthermore, the record
reflects counsel liberally utilized the questionnaires, did not
shy away from exploring questionable responses, and worked to

_____

[6]  Muralt appears to have answered "No" to Question 37 on
the basis that he thought a person who did not believe in the
death penalty could not be asked to consider it.  In fact, there
is every indication in his answer that he would abide by the laws
of Oregon and follow the instructions of the trial judge.

23 - OPINION AND ORDER

convince potential jurors of what counsel deemed to be the law's preference for a non-death sentence even in the face of an aggravated-murder conviction.

In summary, the Court's review of the available *voir dire* transcript reveals counsel (1) had read the questionnaires, (2) had them in hand for reference during the *voir dire* itself, and (3) did not shy away from exploring issues that concerned them. Between the no *voir dire* jurors' questionnaire responses and the available examples of how counsel questioned potential jurors in *voir dire*,[7] the Court finds Petitioner has failed to present evidence that demonstrates prejudice due to the lack of a complete second penalty-phase *voir dire* transcript sufficient to excuse his procedural default of Claims III(B)(6), X(C), XI(D)(4), and XXI(A).[8] Accordingly, the Court dismisses these defaulted claims without prejudice.

---

[7] Petitioner's second penalty-phase counsel aver as follows: "[Co-counsel] and I developed a set of questions to use during voir dire. I have been shown selected excerpts from the voir dire proceedings. The questions I asked would have been based upon my set of questions. These questions would have been repeated to all jurors that I questioned." The Court's review of the available *voir dire* transcript confirms counsel's statement that counsel followed a relatively consistent formula in their questioning of potential jurors.

[8] Because the Court concludes Petitioner cannot demonstrate prejudice based on the missing portion of the second penalty-phase *voir dire* transcript, the Court need not analyze whether Petitioner was prejudiced by any failure on his PCR counsel's part to secure the transcript and/or to raise claims of ineffective assistance of trial or any failure on the part of his direct appellate counsel for not securing same.

24 - OPINION AND ORDER

II.   **"Cause and Prejudice" under _Martinez v. Ryan_**

According to Petitioner, he can demonstrate cause and prejudice pursuant to _Martinez_ to excuse any default of the following ineffective assistance of guilt-phase and second penalty-phase trial counsel claims:

Ineffective Assistance of Guilt-Phase Trial Counsel Claims

1.   Guilt phase counsel, Christopher Burris, was unqualified, did not have sufficient time to prepare, and failed to obtain a qualified capital defense team. Claim VI.A.1-4.[9]

2.   Burris failed to review evidence contained in the prosecution files within six weeks of trial. Claim VI.B.3.

3.   Burris failed to call critical witnesses or present evidence to support a defense theory that petitioner's use of drugs left him unable to form intent and to support a diminished capacity defense. Claim VI.C.5.B(vii).[10]

---

[9] Briefly, in Subclaim One Petitioner alleges under the then-existing American Bar Association (ABA) policies that two qualified attorneys should have been appointed to represent Petitioner in this death-penalty case; in Subclaim Two Petitioner alleges Burris was not qualified to represent Petitioner as lead counsel based on the fact that he did not have any capital experience and had never handled an aggravated-murder trial; in Subclaim Three Petitioner alleges Burris had too little time to prepare for trial and failed to do so; and in Subclaim Four Petitioner alleges neither Burris nor his predecessor ever obtained appointment of a capital-defense team, including a mitigation specialist.

[10] The parties agree Petitioner fairly presented this claim to the state courts and that it is fully exhausted. Accordingly, the Court will consider Claim VI.C.5.B(vii) on the merits in due course.

4.    Burris failed to seek and obtain an instruction that witnesses Meadows, Mace and Varzali should be viewed as accomplices and their testimony evaluated in that light.  Claim VI.C.8.

5.    Burris failed to ensure the preservation of an adequate state court record for appeal, post-conviction, and Federal Habeas proceedings.  Claim VI.E.

6.    Petitioner did not and could not have, knowingly and intelligently waived any claims regarding Burris' deficient performance.  Claim VI.F.

7.    In requiring petitioner to sign the waiver, the trial court interfered with petitioner's constitutional right to the assistance of counsel, resulted in a conflict with, and abandonment by, counsel, and requires a grant of relief without any further assessment of prejudice. Claim VI.G.[11]

Ineffective Assistance of Second Penalty-Phase Trial Counsel Claims

1.    Second Penalty-Phase Counsel, Keith Walker and Ray Bassel, failed to obtain a transcript of the medical examiner's testimony at co-defendant's trial and to have the medical examiner testify at petitioner's resentencing on specific issues.  Claim XI.E.1.B.

2.    Walker and Bassel failed to present all available evidence bearing on petitioner's guilt of aggravated murder versus felony murder, or appropriateness of the death penalty, including:  evidence of co-defendant's prior history of hog-tying and the medical examiners admissions there was likely no intent to kill and certainly no torture-murder.  Claim XI.E.2.A.

3.    Walker and Bassel failed to adequately *voir dire* the jury about their attitudes about the death penalty, and their ability to give a life sentence to an individual

---

[11] The Court notes Claims VI.F and VI.G are not claims of ineffective assistance of counsel and, therefore, would not fall under the purview of *Martinez*.  Nevertheless, the Court's analysis of the waiver issue in Claim VI.E. below applies equally to these claims, and the Court dismisses them without prejudice.

who had already been convicted of six counts of
aggravated murder.  Counsel failed to lay a foundation
for challenges for cause for such jurors, and failed to
present those challenges when necessary.  Claim XI.D.3.

4.    Walker and Bassel failed to ensure the *voir dire* of the
second penalty-phase jury was transcribed and made part
of the record for appeal, post-conviction and capital
habeas proceedings.  Claim XI.D.4.

5.    Walker and Bassel failed to obtain every transcript,
and to designate a full and complete record for
appellate, post-conviction and federal habeas review of
petitioner's death sentence.  Claim XI.H.3.

Petitioner's Br. [330] at 4-5.

Respondent, in turn, argues:  (1) *Martinez* should not apply
here because Petitioner had PCR counsel who litigated claims on
his behalf, including claims of ineffective assistance of trial
counsel and claims against appellate counsel for failing to
request the *voir dire* transcript and to raise an issue on appeal
concerning the denial of these transcripts and (2) even if the
*Martinez* exception applies, it is not satisfied because none of
the ineffective-assistance claims are "substantial" and
Petitioner cannot show PCR counsel was constitutionally
ineffective for failing to raise them.

A.    **Guilt-phase counsel, Christopher Burris, was**
**unqualified, did not have sufficient time to prepare,**
**and failed to obtain a qualified capital-defense team.**
**Claim VI.A.1-4.**

Petitioner does not elaborate on this claim in his briefs.
The Court, however, addressed a similar argument in its Order
[#168] issued June 26, 2009:

27 - OPINION AND ORDER

> The Ninth Circuit has held an ineffective
> assistance of counsel claim cannot be based solely
> on counsel's inexperience.  While "'[t]he
> character of a particular lawyer's experience may
> shed light on an evaluation of his actual
> performance, it does not justify a presumption of
> ineffectiveness in the absence of such an
> evaluation.'"  *Ortiz v. Stewart*, 149 F.3d 923, 933
> (9th Cir. 1998)(quoting *United States v. Cronic*,
> 466 U.S. 648, 665 (1984)).  This reasoning
> underscores the principle that this Court must
> examine counsel's actual performance to discern
> whether Petitioner's Sixth Amendment right to
> counsel has been adequately preserved.

Moreover, with regard to Petitioner's suggestion that Burris

performed ineffectively by failing to seek appointment of second

counsel pursuant to the prevailing standard of care set forth in

the relevant ABA guidelines, such failure can give rise to habeas

relief only if the Court first determines the absence of co-

counsel prejudiced the defense.  *Cf. Allen v. Woodford*, 395 F.3d

979, 993 (9th Cir. 2005)(explaining there cannot be deficient

performance unless the record shows counsel was unable to try the

case alone); *Riley v. Taylor*, 277 F.3d 261, 306 (3d Cir.

2001)("The Constitution does not specify the number of lawyers

who must be appointed.  If a single attorney provides reasonably

effective assistance, the Constitution is satisfied, and if a

whole team of lawyers fails to provide such assistance, the

Constitution is violated.").

Similarly, to support his assertion that counsel had

inadequate time to prepare, Petitioner must show specific

prejudice resulted from counsel's alleged lack of time.  *See*

*United States v. Cronic*, 466 U.S. 648, 665-66 (1984). Petitioner also asserts in Subclaim Three that counsel "did not seek to retain experts to evaluate the case until April 29, 1988, less than three weeks prior to voir dire" and that this dramatically impaired counsel's performance. Petitioner, however, fails to identify the way in which counsel's performance was impaired.

Finally, as noted, Petitioner alleges Burris failed to assemble a capital-defense team, including a mitigation specialist. Petitioner, however, has not supported his allegation factually or shown the way in which counsel's alleged omission resulted in a reasonable probability of prejudice to Petitioner. Moreover, with regard to counsel's alleged failure to obtain a mitigation specialist, the Oregon Supreme Court granted Petitioner sentencing-phase relief on its first direct review of his initial death sentence and provided him with a second penalty-phase trial. Thus, Petitioner cannot show he was prejudiced by any failure of Burris to hire a mitigation expert.

Accordingly, because Petitioner fails to describe how counsel's alleged acts or omissions resulted in prejudice independent from his other allegations of ineffective assistance, Petitioner has not shown these subclaims are substantial under *Martinez*, and, therefore, the Court concludes the procedural default of these subclaims is not excused.

29 - OPINION AND ORDER

**B.    Burris failed to review evidence contained in the prosecution files within six weeks of trial.  Claim VI.B.3.**

Petitioner alleges "Burris failed to make any effort to see the prosecution files held by the district attorney, and had not seen those files less than six weeks prior to trial--in marked contrast to counsel for Cornell, who had visited the district attorney to review the material at least twice.  (State's Transcript Designation Part L, Omnibus Hearing Vol. IV, at 712.)."  Am. Pet. [#85] at 115.  According to Petitioner, a review of the prosecutor's entire file would have "disclosed significant information about the crime and the potential defense of voluntary intoxication."  Br. [#330] at 8.  Petitioner argues the following information in the file would have led counsel to conduct further fruitful investigation as to (1) information regarding co-defendant Cornell, (2) reports from Petitioner's correctional counselor outlining Petitioner's alcohol and drug addictions, and (3) presentence reports reflecting Petitioner attended Maclaren School for Boys and had an extensive history of alcohol-related offenses.  Petitioner maintains there cannot be a strategic rational for counsel's failure to discover and to utilize this evidence in support of the involuntary-intoxication instruction included in the jury instructions at trial. Petitioner further argues counsel's failures prejudiced Petitioner because even though counsel pursued that defense,

counsel failed to support the defense with readily available
evidence.  The State, however, contends Petitioner's PCR counsel
raised a claim of ineffective assistance based on Burris's
failure to investigate and to present available evidence
supporting an involuntary-intoxication defense, and, therefore,
any such claim is fully exhausted.

       To the extent that this claim involves counsel's failure to
discover and to present evidence supporting an involuntary-
intoxication defense, which the Court finds is the main thrust of
Petitioner's claim, it overlaps with fully-exhausted Claim
VI.C.5.B(vii).  Thus, the State's argument is well-taken.  To the
extent that Petitioner argues there might have been additional
useful evidence contained in the prosecutor's complete file
related to co-defendant Cornell or to Petitioner's history at
Maclaren, Petitioner has failed to elaborate on the import of
this evidence or to demonstrate how counsel's failure to discover
and to utilize this evidence resulted in a reasonable probability
of prejudice.  The Supreme Court has held "the duty to
investigate does not force defense lawyers to scour the globe on
the off chance something will turn up; reasonably diligent
counsel may draw a line when they have good reason to think
further investigation would be a waste."  *Rompilla v. Beard*, 545
U.S 374, 383 (2005).

Accordingly, the Court concludes Petitioner has failed to demonstrate that this claim is substantial under *Martinez,* and, therefore, its procedural default is not excused.

**C.**    **Burris failed to seek and to obtain an instruction that witnesses Meadows, Mace, and Varzali should be viewed as accomplices and that their testimony should be evaluated in that light.  Claim VI.C.8.**

According to Petitioner, the same accomplice instruction given in co-defendant Cornell's case was available to Petitioner at trial.  Petitioner maintains the instruction would have meshed with Burris's trial theory that the victim, Ruffner, was alive after any robbery, and, therefore, there was not any strategic reason to omit such an instruction.  Br. [#330] at 9.[12]  The State maintains this claim fails for lack of proof because Petitioner does not argue the witnesses could have been charged as aiders-and-abettors for Ruffner's murder and he fails to show there was "no other evidence other than their testimony on key points necessary for his conviction."

Even assuming counsel rendered ineffective assistance by failing to request the referenced accomplice instructions, "the

---

[12] In his argument in support of his accomplice-instruction claim, Petitioner also asserts the jury instructions did not include an instruction that Petitioner personally had to commit the murder in order to satisfy the requirements for aggravated murder.  In its Order [#168] at 42-45, however, the Court specifically examined the adequacy of the trial court's instruction defining "personally" in the context of an aggravated-murder charge.  Accordingly, Petitioner's argument is without merit.

controlling issue remains whether the attorney's failure to request the instructions prejudiced the defendant." *See Bonin v. Vasquez*, 794 F. Supp. 957, 970 (C.D. Cal 1992). "In assessing prejudice, the reviewing court should consider such factors as whether the accomplices' testimony was corroborated, whether the trial court gave general credibility instructions, and whether defense counsel questioned the accomplices' credibility during closing argument." *Id.* (citing *United States v. Bosch*, 914 F.2d 1239, 1248 (9th Cir. 1990)).

Petitioner highlights the fact that these witnesses gave virtually the same testimony in the trials of both Petitioner and Cornell. Petitioner then summarily concludes if Petitioner's counsel had requested the instruction as defense counsel did in Cornell's case, there is a reasonable probability that the trial court also would have given the instruction in Petitioner's case. Petitioner also asserts if the accomplice instruction had been given and the jury had been instructed to view the testimony from these accomplices with skepticism, it "would have undermined Varzali's credibility and weakened the State's argument with respect to Petitioner's planning of the Ruffner crime and his demeanor afterwards." Petitioner, however, neither supports this statement with reference to evidence in the record nor addresses the above-noted factors to support his allegations that he was prejudiced because of counsel's failure to request the

33 - OPINION AND ORDER

instruction; *i.e.*, Petitioner does not address whether the witnesses' testimony was corroborated, whether the trial court gave general credibility instructions (it did), and whether petitioner's counsel challenged the witnesses credibility in closing (he did). *See* Tr. of State Ct. Proceedings [#44] at 48-50, 55-56, 81-82. In short, Petitioner does not credibly demonstrate, as he must do, that omission of the referenced accomplice instruction resulted in a reasonable probability of prejudice to him.

Accordingly, the Court concludes Petitioner has not satisfied *Martinez* with regard to this claim, and, therefore, its procedural default is not excused.

D.    **Burris failed to ensure the preservation of an adequate state-court record for appeal, post-conviction, and federal habeas proceedings. Claim VI.E.**

Petitioner argues counsel was ineffective for failing to obtain a complete transcript of *voir dire* and a transcript of what Petitioner characterizes as the waiver of conflict of counsel inquiry.

The missing *voir dire* transcript is from the second penalty-phase trial, however, and Burris cannot be faulted for failing to preserve that record. The Court also comprehensively addressed the issue of missing documents in its previous Order [#168] at 54-59, including the alleged missing transcript of the waiver hearing. In that Order the Court specifically held the waiver

hearing involved Petitioner's waiver of his right to later
challenge the appointment of Burris based on the fact that Burris
was married to a deputy district attorney in Washington County
where the aggravated-murder charges against Petitioner were
pending.  The Court rejected any notion that Petitioner had
waived his ability to raise any claims for ineffective assistance
of counsel and ultimately found "there is not any basis to
conclude the absence of this record had any meaningful impact on
Petitioner's ability to exhaust some or all of his claims."

Accordingly, the Court concludes Petitioner has not
satisfied *Martinez* with regard to this claim, and, therefore, its
procedural default is not excused.

**E.    Second Penalty-Phase Counsel, Keith Walker and Ray
        Bassel, failed to obtain a transcript of the medical
        examiner's testimony at co-defendant's trial and to
        have the medical examiner testify at Petitioner's
        resentencing on specific issues.  Claim XI.E.1.B.**

In Petitioner's First Amended Petition [#85] at 180
Petitioner alleges:

> B.    Counsel failed to proper[l]y address the
>       testimony of medical examiner, Dr. Lewman.
>       As noted *supra* in the Second and Sixth Claim
>       for Relief, Dr. Lewman testified at Cornell's
>       trial to several critical facts:  that the
>       gag did not have to kill Mr. Ruffner, so his
>       death was possibly accidental; that Mr.
>       Ruffner would have been rendered unconscious
>       within 20 seconds after the gag occluded his
>       airway; and that none of the wounds on Mr.
>       Ruffner were likely to have caused severe
>       physical pain.  All of this testimony was
>       already of-record in the Cornell transcript,

but counsel failed to obtain that transcript
and have Dr. Lewman testify on these issues.

The State asserts PCR counsel, Ralph Smith, raised this claim in
Petitioner's Third Amended Petition for Post-Conviction [51-1],
Volume 4, Exhibit 127.  Specifically, Smith alleged Petitioner's
second penalty-phase counsel:

> 24.  Failed to prepare for and properly cross
> examine prosecution witness Dr. Larry Lewman
> by failing to adequately emphasize from
> Dr. Lewman's testimony that the deceased, John
> Ruffner, was uncon[s]cious within 30 seconds and
> dead within short minutes and, therefore, did not
> suffer prior to his death.

During the PCR proceeding the State argued in its responsive
brief that counsel adequately examined Dr. Lewman and elicited
testimony on cross-examination that Ruffner may have lapsed into
unconsciousness within 30 seconds.  The State maintained this was
sufficient to raise the possibility that the victim did not
suffer very long.

There is an obvious overlap between the federal habeas claim
at issue here and the one that Smith raised in the PCR
proceeding.  Although Petitioner alleged in his federal claim
that second penalty-phase counsel was ineffective for failing to
elicit testimony from the medical examiner that Ruffner could
have lost consciousness within 30 seconds and may not have
suffered long, Smith, in fact, raised this claim during the PCR
proceedings, and, therefore, this claim does not fall under the
purview of *Martinez*.  On careful examination, however, the Court

36 - OPINION AND ORDER

concludes the claim is a new one to the extent that it raises
allegations faulting second penalty-phase counsel with failing to
elicit additional testimony from Dr. Lewman conceding that (1)
the gag did not have to kill Ruffner and his death could have
been an accident and (2) none of the victim's injuries were
likely to cause him intense physical pain.[13]  Notwithstanding the
fact that Petitioner had already been convicted on multiple
counts of aggravated murder, this testimony in which Dr. Lewman
conceded a possibility of accidental death was relevant in the
second penalty-phase trial to the question as to whether
Petitioner acted deliberately and with the reasonable expectation
that death would result.  Moreover, the State repeatedly
highlighted evidence that allegedly showed Petitioner tortured
Ruffner and caused him to suffer the same level of excruciating
pain as Randy Brown, which placed the murder, as the State argued
in closing, in the category of one of the "most cold-blooded
killings" warranting the death penalty.[14]  If the medical

_____

[13] At Cornell's trial Dr. Lewman testified that moisture may
have caused the large wad of tissue paper to drift back slightly
and block the victim's airway.  He also testified the air
blockage, head blow, defensive hand wounds, and miscellaneous
abrasions likely did not cause intense physical pain.  Finally,
he testified he did not know whether he would characterize the
pain associated with either the neck ligature or other bindings
as "intense."

[14] Brown testified Petitioner and another man hogtied and
robbed him approximately ten days before the Ruffner murder.
Brown testified the pain from the bindings was excruciating.

37 - OPINION AND ORDER

examiner had conceded on cross-examination, as he did in Cornell's trial, that moisture may have caused the large wad of tissue paper jammed in the back of the victim's throat to drift back slightly and to block the airway, that testimony may have carried weight with one or more jurors.  In addition, if the medical examiner had testified, as he did in Cornell's trial, about the level of pain experienced by the victim, that testimony would have contradicted the State's argument that the torture-murder and the resultant pain experienced by the victim elevated this murder to the category of "one of the worst killings" and warranted the death penalty.

As the State noted during the PCR proceeding, Smith raised a claim faulting second penalty-phase counsel with doing what counsel actually did:  eliciting testimony from Dr. Lewman that the victim could have lost consciousness fairly quickly and did not suffer long.  Smith, however, failed to allege that counsel was ineffective for failing to elicit testimony from the medical examiner that (1) the gag did not necessarily have to kill Ruffner and his death could have been an accident and (2) Ruffner's injuries likely did not cause him intense physical pain.[15]  As noted, this testimony was relevant

---

[15] Smith submitted a copy of the transcript of Cornell's trial as an exhibit during the PCR proceedings.  Accordingly, he had ready access to Dr. Lewman's testimony therein.

to issues raised by the State during the second penalty-phase trial.

The Court, therefore, concludes Petitioner has demonstrated Petitioner's underlying claim of ineffective assistance of counsel has some merit; that it was objectively unreasonable for PCR counsel not to raise this "substantial" claim; and that there is a reasonable probability that, but for PCR counsel's error, the result of the PCR proceeding would have been different.

Accordingly, the Court concludes the procedural default of this claim is excused pursuant to *Martinez*, and the Court will consider this claim on the merits in due course.

**F.    Walker and Bassel failed to present all available evidence bearing on Petitioner's guilt of aggravated murder versus felony murder or the appropriateness of the death penalty, including evidence of co-defendant's prior history of hog-tying and the medical examiner's admissions that there was likely no intent to kill and certainly no torture-murder.   Claim XI.E.2.A.**

Respondent argues Dr. Lewman's testimony during Cornell's guilt-phase trial did not have any bearing on the issues before Petitioner's second penalty-phase jury because the State did not have to show the victim suffered "intense physical pain," which is a requirement for proving torture-murder.  Although it is true that the State did not have to prove this specific element in the penalty phase, nevertheless, the State highlighted evidence (presumably to justify the appropriateness of a death sentence)

that showed the victim was tortured and that he suffered the same excruciating pain as Brown.  The Court, therefore, concludes the evidence was, at a minimum, relevant to counter the State's argument.

In addition, Petitioner's second penalty-phase counsel sought to counter the State's contention that Petitioner was the leader or "mastermind" of the Brown and Ruffner crimes.  In closing arguments counsel supported their argument that Cornell was the leader with evidence that he carried the knife, had Ruffner's checkbook and credit cards, signed for the meal at the Fish Grotto, wore Ruffner's rings, and had Ruffner's suitcases. Counsel, however, failed to introduce evidence that Cornell had a prior history of hog-tying a robbery victim years before the Brown and Ruffner crimes.[16]  This evidence suggesting that hog-tying was Cornell's brainchild would have been relevant to show Cornell rather than Petitioner was the leader and that Cornell was the more culpable actor responsible for Ruffner's hog-tying death.

The Court concludes on this record that Petitioner has shown his claim faulting counsel with failing to introduce this readily

---

[16] The State introduced evidence at Cornell's trial that he was identified as one of two individuals who robbed a clerk at a Plaid Pantry store in Portland in 1976 by taking the clerk into a back room of the store and hog-tying his hands and feet behind his back with a shoelace and electrical cord (two of the same items used to truss Ruffner).

available evidence has some merit; that it was objectively
unreasonable for PCR counsel not to raise this "substantial"
claim; and that there is a reasonable probability that, but for
PCR counsel's error, the result of the PCR proceeding would have
been different.  Accordingly, the Court concludes the procedural
default of Petitioner's claim is excused pursuant to *Martinez,*
and the Court will consider this claim on the merits in due
course.

For the reasons already discussed regarding second penalty-
phase counsel's performance during *voir dire*, the missing portion
of the second penalty-phase *voir dire* transcript and any
transcript related to Petitioner's waiver concerning Burris's
representation, the Court concludes Petitioner has not
demonstrated Claims XI.D.3, XI.D.4, and XI.H.3 are substantial
under *Martinez*, and, therefore, their procedural default is not
excused.

## CONCLUSION

For these reasons, the Court resolves the questions whether
Petitioner has established prejudice due to the missing portion
of the second penalty-phase *voir dire* transcript and whether he
has established cause and prejudice to excuse the default of

certain claims of ineffective assistance of trial counsel

pursuant to *Martinez v. Ryan* as follows:

1.  Petitioner has failed to establish that he has been
    prejudiced due to the missing portion of the second
    penalty-phase *voir dire* transcript.  Thus, the Court
    **DISMISSES without prejudice** Petitioner's defaulted
    Claims III(B)(6), X(C), XI(D), and XXI(A).

2.  Petitioner has failed to establish that the following
    defaulted claims of ineffective assistance of trial
    counsel are substantial under *Martinez*:  Claims VI.A.1-
    4, VI.B.3, VI.C.8, and VI.E.  Accordingly, the Court
    **DISMISSES without prejudice** these defaulted claims.  In
    addition, the Court **DISMISSES without prejudice**
    defaulted Claims VI.F. and VI.G.

3.  The Court will address the merits of Claim
    VI.C.5.B(vii) in due course.

4.  Except as to that part of Claim XI.E.1.B. in which
    Petitioner alleges second penalty-phase counsel failed
    to elicit testimony from Dr. Lewman that the victim
    could have lost consciousness within 30 seconds and may
    not have suffered long, Petitioner has demonstrated
    Claim XI.E.1.B. has some merit, that PCR counsel
    rendered ineffective assistance in failing to raise
    this claim, and that its procedural default is excused
    pursuant to *Martinez*.  The Court, therefore, will
    address the merits of Claim XI.E.1.B. in due course.

5.  Petitioner has demonstrated Claim XI.E.2.A. has some
    merit, that PCR counsel rendered ineffective assistance
    in failing to raise this claim, and that its procedural
    default is excused pursuant to *Martinez*.  The Court,
    therefore, will address the merits of Claim XI.E.2.A.
    in due course.

The Court notes this matter has been pending for more than eight years.  The time has come to address merits briefing on a firm schedule that the Court is about to set.  The Court, therefore, directs counsel to confer and to submit **no later than February 2, 2015,** a detailed, jointly-proposed case-management schedule that enumerates the merits issues still to be resolved and that proposes a briefing and hearing schedule to do so without further delay.

IT IS SO ORDERED.

DATED this 15th day of January, 2015.

/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge

43 - OPINION AND ORDER